**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

FRANCISCO JAVIER GARFIAS-
RODRIGUEZ,
                              *Petitioner,*

            v.

ERIC H. HOLDER, Jr., Attorney
General,
                              *Respondent.*

No. 09-72603

Agency No.
A079-766-006

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted En Banc
June 20, 2012—Pasadena, California

Filed October 19, 2012

Before: Alex Kozinski, Chief Judge, Stephen Reinhardt,
Susan P. Graber, Raymond C. Fisher, Ronald M. Gould,
Richard A. Paez, Johnnie B. Rawlinson, Richard R. Clifton,
Jay S. Bybee, Sandra S. Ikuta, and Mary H. Murguia,
Circuit Judges.

Opinion by Judge Bybee;
Concurrence by Chief Judge Kozinski;
Concurrence by Judge Gould;
Partial Concurrence and Partial Dissent by Judge Graber;
Dissent by Judge Reinhardt;
Dissent by Judge Paez

12583

# SUMMARY

### Immigration/Removal and Asylum

The court of appeals denied a petition. The court held that aliens who are inadmissible under § 212(a)(9)(C)(i)(I) are not eligible for adjustment of status under § 245(i).

Petitioner Francisco Garfias-Rodriguez—a citizen of Mexico who had married a United States citizen and applied to adjust his status to that of a lawful permanent resident—was charged with being removable from the United States as an alien present in the United States without being admitted or paroled under § 212(a)(6)(A)(i) of the Immigration and Nationality Act. Garfias-Rodriguez was also allegedly removable under INA § 212(a)(9)(C)(i) as an alien who had been unlawfully present in the United States for an aggregate period of more than one year and reentered without permission. Garfias-Rodriguez conceded removability but requested adjustment of status under § 245(i) and voluntary departure.

The immigration judge denied relief and the Board of Immigration Appeals dismissed Garfias-Rodriguez's appeal pursuant the BIA's decision in *In re Briones*, which held that an alien could not seek status adjustment under § 245(i) if he was ineligible for admission under § 212(a)(9)(C)(i)(I). The BIA gave Garfias-Rodriguez 60 days to voluntarily depart, but informed him that filing a petition for review would automatically terminate the grant of voluntary departure.

Garfias-Rodriguez petitioned for review. A panel of the court of appeals denied Garfias-Rodriguez's petition, but the court later decided to rehear the case en banc.

**[1]** An applicant's status may be adjusted under § 245(i) only if the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence. **[2]** Section 212 renders inadmissible any alien who has been

unlawfully present in the United States for an aggregate period of more than one year, and who enters or attempts to reenter the United States without being admitted. **[3]** Congress has not explained how to handle an alien who is inadmissible under § 212(a)(9)(C)(i)(I) but otherwise qualified for adjustment of status under § 245(i).

**[4]** In *Acosta v. Gonzales*, the Ninth Circuit held that aliens inadmissible under § 212(a)(9)(C)(i)(I) remained eligible for adjustment of status under § 245(i). **[5]** However, in *Briones*, the BIA concluded that aliens who are inadmissible under § 212(a)(9)(C)(i)(I) cannot qualify for § 245(i) adjustment, absent a waiver of inadmissibility. **[6]** The BIA's interpretation was a permissible reading of the statute. In light of the BIA's reasoned opinion, the court of appeals held that *Briones* was entitled to deference. The court of appeals concluded that aliens who are inadmissible under § 212(a)(9)(C)(i)(I) are not eligible for adjustment of status under § 245(i). The court overruled *Acosta* to the extent it holds otherwise.

**[7]** An agency may act through adjudication to clarify an uncertain area of the law, so long as the retroactive impact of the clarification is not excessive or unwarranted. **[8]** Garfias-Rodriguez could not avoid the retroactive effect of *Briones* on his case. **[9]** When he filed his § 245(i) application in 2002, Garfias-Rodriguez had no reliance interest because the law was not settled or well established. The court of appeals held that the BIA properly applied the *Briones* rule to Garfias-Rodriguez.

**[10]** Under 8 C.F.R. § 1240.26(i), if an alien files a petition for review of a final removal order, any grant of voluntary departure shall terminate automatically upon the filing of the petition or other judicial challenge. **[11]** Other circuits have acknowledged that this regulation resolves the question of whether courts have authority to stay the voluntary departure period pending review, since it provides for the automatic termination of that period. **[12]** The court of appeals agreed with

its sister circuits, concluding that, assuming that § 1240.26(i) is valid, it had no authority to issue an equitable stay of Garfias-Rodriguez's voluntary departure period.

**[13]** The Sixth Circuit has squarely held that § 1240.26(i) is a reasonable interpretation of § 1229c(e). The court of appeals joined the Sixth Circuit in finding the regulation to be a valid exercise of delegated power. **[14]** In light of the broad grant of discretion over voluntary departure in both §§ 1229c(b)(1) and 1229c(e), it had to be held that the promulgation of § 1240.26(i) was a proper exercise of the Attorney General's authority. **[15]** Garfias-Rodriguez's grant of voluntary departure terminated upon his decision to file a petition for review. His petition had to be denied.

Chief Judge Kozinski concurred in part, writing that because this case involved no retroactive application of law, there was no reason to discuss retroactivity.

Judge Gould concurred in the result, disagreeing with the test the majority applied to determine when an agency's decision should be applied retroactively.

Judge Graber concurred in part, and dissented in part, writing that under either framework for deciding retroactivity, retroactive application of the new legal rule was appropriate.

Judge Reinhardt dissented, writing that the regulation automatically terminating voluntary departure in the event that a non-citizen has the temerity to file a petition for review of the BIA's decision on the underlying issue with the court of appeals effectively penalizes non-citizens for exercising a fundamental right in the American legal system; the regulation is an improper exercise of the powers delegated to the Attorney General.

Judge Paez dissented, writing that, applying the proper retroactivity test, *Chevron Oil*, the rule of *Briones* should apply in the Ninth Circuit only prospectively.

## COUNSEL

Matt Adams, Northwest Immigrant Rights Project, Seattle, Washington, for the petitioner.

Stuart F. Delery, Acting Assistant Attorney General, Donald E. Keener, Deputy Director, and Luis E. Perez, Senior Litigation Counsel, Department of Justice, Civil Division, Washington, D.C.; John W. Blakeley, Senior Litigation Counsel, Department of Justice, Office of Immigration Litigation, Washington, D.C., for the respondent.

Gary A. Watt, Amicus Curiae, Hastings Appellate Project, Pro Bono Counsel for Eriberto Errera, San Francisco, California.

Beth Werlon, Amicus Curiae, Named Plaintiffs and Proposed Redefined Class in *Duran Gonzales v. Department of Homeland Security*, No. 09-35174 (9th Cir.), Washington, D.C.

Charles Roth, Amicus Curiae, National Immigration Justice Center, Chicago, Illinois.

Stephen W. Manning, Amicus Curiae, American Immigration Lawyers Association, Washington, D.C.

---

## OPINION

BYBEE, Circuit Judge:

In *National Cable & Telecommunications Ass'n v. Brand X Internet Services*, the Supreme Court instructed federal courts to defer to reasonable agency interpretations of ambiguous statutes, even when those interpretations conflict with the prior holding of a federal circuit court. 545 U.S. 967, 982-83 (2005). That is the situation we confront here. In *Acosta v.*

*Gonzales*, 439 F.3d 550, 553-56 (9th Cir. 2006), we held that aliens who are inadmissible under § 212(a)(9)(C)(i)(I) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1182(a)(9)(C)(i)(I), are eligible for adjustment of status under INA § 245(i), 8 U.S.C. § 1255(i), in spite of the latter section's requirement of admissibility. A year later, the Board of Immigration Appeals ("BIA") decided that such aliens are *not* eligible to apply for adjustment of status under § 245(i) in *In re Briones*, 24 I. & N. Dec. 355, 371 (BIA 2007). In this case, we must decide whether to defer to the agency's interpretation of the INA and overrule *Acosta* and, if so, whether the agency's interpretation may be applied to Garfias retroactively.

We conclude that we must defer to the BIA's decision, and we hold that the BIA's decision may be applied retroactively to Garfias. We thus deny his petition for review.

## I.   FACTS AND PROCEDURAL HISTORY

Francisco Javier Garfias-Rodriguez ("Garfias") is a native and citizen of Mexico. He unlawfully entered the United States in 1996 and briefly departed twice, first to visit his ailing mother in 1999 and then to attend her funeral in 2001. He reentered the United States without permission both times. In April 2001, Garfias's then-current employer filed an application for labor certification with the Oregon Employment Department on his behalf but later withdrew the application after he ceased working for that employer. Garfias married his wife Nancy, a United States citizen, in April 2002. He applied to adjust his status to that of a lawful permanent resident in June of 2002, paying a total of $1305 in fees. In 2004, United States Citizenship and Immigration Services issued Garfias a Notice to Appear ("NTA") charging him with removability under INA § 212(a)(6)(A)(i), as "[a]n alien present in the United States without being admitted or paroled," and § 212(a)(9)(C)(i), as an alien who has been "unlawfully pres-

ent in the United States for an aggregate period" of more than one year and reentered without permission.

In proceedings before an immigration judge ("IJ"), Garfias conceded removability on both grounds charged in the NTA. He requested relief in the form of adjustment of status and, in the alternative, voluntary departure. In July 2004, the IJ denied Garfias's application for status adjustment, holding that Garfias was inadmissible under INA § 212 and thus ineligible for adjustment under § 245(i). In a per curiam decision in March 2006, the BIA sustained Garfias's appeal. The BIA noted that "the Ninth Circuit, in whose jurisdiction this proceeding arises, held that an alien inadmissible under section 212(a)(9)(C)(i) of the Act could apply for adjustment of status under section 245(i) in conjunction with a request that the Attorney General retroactively consent to his reapplying for admission," and remanded the case to the IJ for reconsideration in light of those decisions. *See Acosta*, 439 F.3d at 556; *Perez-Gonzalez v. Ashcroft*, 379 F.3d 783 (9th Cir. 2004).

On remand, Garfias renewed his application for adjustment of status, but in November 2007 the IJ once again denied the request for adjustment. The IJ found that Garfias could not establish that his application was filed before § 245(i)'s expiration date of April 30, 2001.[1] The IJ reasoned that Garfias's application based on his marriage to a U.S. citizen was filed after April 30, 2001, and he was not grandfathered in by his application for a labor certification because there was no proof the labor certification was "properly filed." Garfias again appealed to the BIA.

The BIA dismissed his appeal in July 2009. It did not rule

---

[1]Section 245(i) relief is only available to an alien physically present in the United States "who is the beneficiary . . . of . . . a petition for classification . . . filed . . . on or before April 30, 2001; or . . . an application for a labor certification . . . filed pursuant to the regulations of the Secretary of Labor on or before such date." 8 U.S.C. § 1255(i)(1)(B).

on the IJ's grounds for denying the application. Instead, the BIA noted that subsequent to the IJ's decision, it had issued *In re Briones*, 24 I. & N. Dec. at 371, which held that an alien could not seek status adjustment under § 245(i) if he was ineligible for admission under § 212(a)(9)(C)(i)(I). The BIA then explained that since this court had abrogated *Perez-Gonzalez* under a *Brand X* theory, *see Duran Gonzales v. Dep't of Homeland Sec. (Duran Gonzales I)*, 508 F.3d 1227, 1241-42 (9th Cir. 2007), the BIA could now apply the *Briones* rule to cases arising in the Ninth Circuit. It therefore dismissed the appeal, granted Garfias sixty days to voluntarily depart, ordered removal in the event that he failed to depart, and informed him that filing a petition for review would automatically terminate the grant of voluntary departure.

Garfias filed a petition for review with this court. He raised three arguments: (1) that *Briones* is not entitled to *Chevron*[2] deference, (2) that *Briones* should not be applied to his case retroactively, and (3) that 8 C.F.R. § 1240.26(i), which terminates any grant of voluntary departure upon the filing of a petition for judicial review of a removal order, is an invalid exercise of statutorily delegated power. A panel of this court rejected his claims and denied the petition for review. *Garfias-Rodriguez v. Holder*, 649 F.3d 942, 953 (9th Cir. 2011). We granted Garfias's petition for rehearing en banc. *Garfias-Rodriguez v. Holder*, 672 F.3d 1125 (9th Cir. 2012).

---

[2]*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-44 (1984), held that courts must defer to a reasonable agency interpretation of an ambiguity in a statute that the agency is charged with administering. *Chevron* step one asks "whether Congress has directly spoken to the precise question at issue"; step two asks whether the agency's interpretation is reasonable. *Id.*

## II.   LEGAL BACKGROUND

### A.   *The Tension Between INA § 212(a)(9)(C) and § 245(i)*

**[1]** Congress enacted § 245(i) in 1994 to provide an avenue for "aliens who entered without inspection but who have access to a visa (typically an immigrant spouse of a citizen) to legalize their status without leaving the country and incurring a long and needless separation from their family." *Ramirez-Canales v. Mukasey*, 517 F.3d 904, 907-08 (6th Cir. 2008); *see also Briones*, 24 I. & N. Dec. at 359-60. However, the Attorney General is permitted to adjust an applicant's status under this section only if "the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence." 8 U.S.C. § 1255(i)(2)(A).

**[2]** When § 245(i) was first enacted, aliens present in the United States who had entered without inspection were considered "deportable" aliens under former § 241(a)(1)(B) of the INA. *See Briones*, 24 I. & N. Dec. at 362-63 (citing 8 U.S.C. § 1251(a)(1)(B) (1994)). Thus, that provision did not implicate § 245(i)'s requirement that the alien be "admissible" to the United States. However, in 1996, Congress enacted the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), which "recharacterized" as "inadmissible" aliens who had previously been labeled "deportable" for entering the country without inspection. *Briones*, 24 I. & N. Dec. at 363. As a result, § 212 currently renders inadmissible "[a]ny alien who . . . has been unlawfully present in the United States for an aggregate period of more than 1 year, . . . and who enters or attempts to reenter the United States without being admitted." 8 U.S.C. § 1182(a)(9)(C)(i)(I). IIRIRA did not, however, address the effect of this change on the status adjustment provision of § 245(i).

**[3]** In short, although § 245(i) ostensibly provides an avenue for aliens eligible to receive a visa but living illegally in the United States to adjust their status to that of a lawful per-

manent resident, requirement of "admissibility" seems to vitiate that purpose for some illegal aliens in light of the subsequent enactment of § 212(a)(9)(C). Congress has not explained how to handle an alien who is inadmissible under § 212(a)(9)(C)(i)(I) but otherwise qualified for adjustment of status under § 245(i).[3]

B.  *The Ninth Circuit and the BIA Address the Tension*

1.  The Parting of the Ways

In *Perez-Gonzalez*, we held that the inadmissibility provision of INA § 212(a)(9)(C)(i)(II)[4] did not preclude status adjustment under § 245(i). 379 F.3d at 792-95. We declined to defer to a guidance memorandum issued by the Immigration and Naturalization Service ("INS"), which concluded that status adjustment was unavailable to aliens inadmissible under § 212(a)(9)(C)(i)(II), because interpretations in the "informal format[ ]" of a guidance memorandum are not entitled "to the rigorous deference owed formal agency interpretations under *Chevron*." *Id.* at 792-93. Applying a less deferential form of review, we found that the memorandum's interpretation conflicted with "[t]he regulations at 8 C.F.R. § 212.2," which "make the availability of adjustment of status to previously removed aliens explicit." *Id.* at 793.[5] Accordingly, we concluded that "[i]n the absence of a more complete agency

---

[3]Because the BIA did not address the issue of whether Garfias applied for adjustment of status before § 245(i)'s expiration date, we will assume without deciding that Garfias is otherwise qualified to apply for adjustment of status under § 245(i).

[4]Section 212(a)(9)(C)(i)(II) is the companion provision of the subsection at issue in this case, § 212(a)(9)(C)(i)(I). Subsection II makes inadmissible any alien who has been ordered removed and enters or attempts to reenter the United States illegally, and subsection I makes inadmissible any alien who has accrued over a year of unlawful presence in the United States. *See* 8 U.S.C. § 1182(a)(9)(C)(i). Thus, subsection II presents the same conflict with § 245(i) as does subsection I.

[5]8 C.F.R. § 212.2(e) specifies that applicants for adjustment of status "must request permission to reapply for entry in conjunction with [their] application[s] for adjustment of status." We explained that "8 C.F.R. §§ 212.2(e) and (i)(2) expressly permit applicants for adjustment of status who have been previously removed or deported to apply for permission to reapply from within this country." *Perez-Gonzalez*, 379 F.3d at 793.

elaboration of how its interpretation of § 212(a)(9) can be reconciled with its own regulations, we must defer to the regulations rather than to the informal guidance memorandum." *Id.* at 794. The panel denied rehearing, over the dissent of Judge Gould. *Perez-Gonzalez v. Gonzales*, 403 F.3d 1116, 1117-20 (9th Cir. 2005) (Gould, J., dissenting) (dissenting from denial of motion to reconsider denial of petition for panel rehearing).

The BIA subsequently issued *In re Torres-Garcia*, 23 I. & N. Dec. 866 (BIA 2006), accepting our invitation to provide "a more complete agency elaboration," *Perez-Gonzalez*, 379 F.3d at 794, of the conflict between these provisions of the INA. The BIA concluded that "the Ninth Circuit's analysis regarding the availability of a retroactive waiver of the ground of inadmissibility set forth at section 212(a)(9)(C)(i) contradicts the language and purpose of the Act and appears to have proceeded from an understandable, but ultimately incorrect, assumption regarding the applicability of 8 C.F.R. § 212.2." *Torres-Garcia*, 23 I. & N. Dec. at 873. The BIA noted that 8 C.F.R. § 212.2 "was not promulgated to implement current section 212(a)(9) of the Act," but "implement[ed] statutory provisions that were repealed by the IIRIRA." *Id.* at 874-75. It further noted that our decision in *Perez-Gonzalez* effectively allowed § 245(i) to function as a means to "circumvent the statutory 10-year limitation on section 212(a)(9)(C)(ii) waivers" by allowing aliens to "simply reenter[ ] unlawfully before requesting the waiver," given that "it is the alien's unlawful reentry without admission that makes section 212(a)(9)(C)(i) applicable in the first place." *Id.* at 876. The BIA noted that under our reading of § 212, an alien could obtain a "waiver nunc pro tunc even though such a waiver would have been unavailable to him had he sought it prospectively, thereby placing him in a better position by asking forgiveness than he would have been in had he asked permission." *Id.*

**[4]** Next, in *Acosta v. Gonzales*, 439 F.3d at 556, we extended the reasoning of *Perez-Gonzalez* to INA

§ 212(a)(9)(C)(i)(I)—the provision at issue in this case—and held that aliens inadmissible under that section nonetheless remained eligible for adjustment of status under § 245(i). We emphasized that "*Perez-Gonzalez* appears to control the issue . . . before us" and that "any attempt to distinguish the present case from *Perez-Gonzalez* based on the different grounds of inadmissibility involved would be unpersuasive." *Id.* at 554. We did not take note of the BIA's contrary decision in *Torres-Garcia*, which had been issued just one month earlier.

**[5]** The following year, the BIA revisited the question we answered in *Acosta* and again rejected our reasoning. *Briones*, 24 I. & N. Dec. 355. It explained that § 212(a)(9)(C)(i)(I) applies only to aliens "who have departed the United States after accruing an aggregate period of 'unlawful presence' of more than 1 year and who *thereafter* entered or attempted to reenter the United States unlawfully." *Id.* at 365-66. The BIA observed that § 212(a)(9)(C)(i)(I) could therefore trump § 245(i) without rendering the latter provision superfluous. *Id.* It noted that "in every other case where Congress has extended eligibility for adjustment of status to inadmissible aliens . . . it has done so unambiguously, either by negating certain grounds of inadmissibility outright or by providing for discretionary waivers of inadmissibility, or both." *Id.* at 367. Accordingly, the BIA decided that despite our decision in *Acosta*, there was "little merit in the . . . argument . . . that it would be incompatible with the remedial purpose of section 245(i) to make adjustment of status unavailable to . . . aliens [inadmissible under section 212]." *Id.* at 370. The BIA concluded that "aliens who are inadmissible under section 212(a)(9)(C)(i)(I) of the [INA] cannot qualify for section 245(i) adjustment, absent a waiver of inadmissibility." *Id.* at 371. *Briones*, however, explicitly declined to decide whether to apply its interpretation to cases arising in the jurisdiction of the Ninth and Tenth Circuits, *id.* at 371 n.9, which had both reached contrary conclusions. *See Padilla-Caldera v. Gonzales*, 453 F.3d 1237 (10th Cir. 2005).

## 2. The Reconciliation

That same year, we began the process of reevaluating our prior decisions in light of the BIA's decisions in *Torres-Garcia* and *Briones*. First, we addressed the effect of *Torres-Garcia* in *Duran Gonzales I*, 508 F.3d 1227. Applying the framework established by *Chevron* and *Brand X*, we deferred to the BIA's interpretation of § 212(a)(9)(c) in *Torres-Garcia*, and overruled *Perez-Gonzalez*. *Id.* at 1242. We found that in *Perez-Gonzalez* we had determined that the relevant sections of the INA were ambiguous and that the BIA had not, at that time, issued a controlling decision that resolved this ambiguity. *Id.* at 1237-38; *see Brand X*, 545 U.S. at 982. We concluded that the BIA's interpretation of § 212(a)(9)(C)(i)(II) in *Torres-Garcia* was "clearly reasonable and is therefore entitled to *Chevron* deference under *Brand X*." *Duran Gonzales I*, 508 F.3d at 1242. Accordingly, we concluded that "we are bound by the BIA's interpretation of the applicable statutes in *In re Torres-Garcia*, even though that interpretation differs from our prior interpretation in *Perez-Gonzalez*." *Id.*

In 2010, the BIA issued its most recent published opinion on this subject. *In re Diaz and Lopez* rejected the alien's argument that *Briones* should not apply in cases arising in the jurisdiction of the Ninth Circuit due to our decision in *Acosta*. 25 I. & N. Dec. 188, 190-91 (BIA 2010). The BIA noted that the decision in *Acosta* was "constrained by" our previous decision in *Perez-Gonzalez*, which had subsequently been overruled in *Duran Gonzales I*. *Id.* at 190. Citing *Brand X*, the BIA therefore concluded that "[n]either the Immigration Judge nor the Board remains bound by the Ninth Circuit's decision in *Acosta* in light of our subsequently issued decision in *Matter of Briones* and the Ninth Circuit's decision in [*Duran*] *Gonzales* [*I*] to overrule *Perez-Gonzalez*." *Id.*

With that background, we now turn to the case before us.

### III.   DISCUSSION

A.   *Whether* Briones *Is Entitled to* Chevron *Deference*

We must first determine whether aliens who are inadmissible under INA § 212(a)(9)(C)(i)(I) may nonetheless apply for adjustment of status under § 245(i). Deferring to the BIA's decision in *Briones*, we hold that they may not.[6]

#### 1.   Statutory Ambiguity

We begin by asking whether Congress has "spoken to the precise question at issue." *Chevron*, 467 U.S. at 842. Here, Garfias urges us to reaffirm our holding in *Acosta*, where we interpreted the ambiguity between § 212(a)(9)(C)(i)(I) and § 245(i) in the absence of an authoritative interpretation by the BIA. However, we see no basis for distinguishing § 212(a)(9)(C)(i)(I) from § 212(a)(9)(C)(i)(II) or for departing from the reasoning of *Duran Gonzales I*. In *Brand X*, the Supreme Court held that "[a] court's prior judicial construction of a statute trumps an agency construction otherwise entitled to *Chevron* deference only if the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion." 545 U.S. at 982; *see Duran Gonzales I*, 508 F.3d at 1235-36. We believe that *Acosta* was not such a decision.

We wrote in *Acosta* that "[t]he statutes involved do not clearly indicate whether the inadmissibility provision or the penalty-fee adjustment of status provision should take precedence," and reached our conclusion by relying heavily on our

---

[6]We have jurisdiction under 8 U.S.C. § 1252(a)(5). We review de novo purely legal questions concerning the meaning of the immigration laws. *See Altamirano v. Gonzales*, 427 F.3d 586, 591 (9th Cir. 2005). We defer to the BIA's interpretation and application of immigration laws unless its interpretation is "contrary to the plain and sensible meaning of the law at issue." *Poblete Mendoza v. Holder*, 606 F.3d 1137, 1140 (9th Cir. 2010).

earlier *Perez-Gonzalez* decision. *Acosta*, 439 F.3d at 553-55. Other circuits have also noted that the tension between § 212(a)(9)(C) and § 245(i) creates a statutory ambiguity that cannot be resolved conclusively by resort to the text. *See, e.g.*, *Cheruku v. Att'y Gen.*, 662 F.3d 198, 204 (3d Cir. 2011); *Renteria-Ledesma v. Holder*, 615 F.3d 903, 908 (8th Cir. 2010) ("A literal reading of [8 U.S.C.] § 1255(i) would render the adjustment of status provision a virtual nullity, because aliens who 'entered the United States without inspection,' as required by § 1255(i)(1)(A)(i), generally are not 'admissible,' as required by § 1255(i)(2)(A)."); *Ramirez v. Holder*, 609 F.3d 331, 335-36 (4th Cir. 2010); *Herrera-Castillo v. Holder*, 573 F.3d 1004, 1007-08 (10th Cir. 2009); *Mora v. Mukasey*, 550 F.3d 231, 237-38 (2d Cir. 2008); *Ramirez-Canales*, 517 F.3d at 907-08; *see also Lemus-Losa v. Holder*, 576 F.3d 752, 760 (7th Cir. 2009) ("If the question before us were . . . the relation between [8 U.S.C. § 1182(a)(9)](C)(i)(I) and § 1255(i) . . . we would agree that there is sufficient ambiguity in these provisions to require *Chevron* deference, and we would find that the BIA has drawn a rational line."). The BIA has also acknowledged this ambiguity, noting that "the plain language of the statute seems to make 'entry without inspection' both a qualifying and a disqualifying condition for adjustment of status." *Briones*, 24 I. & N. Dec. at 362.

We previously refused to give deference to the BIA's interpretation only because it came in the form of a guidance memorandum, which we held was "not entitled to the same rigorous deference due agency regulations." *Acosta*, 439 F.3d at 554. In deciding *Briones*, however, the BIA has issued a formal agency interpretation of the INA and provided a thoroughly developed opinion that disagrees with our interpretation in *Acosta*. Additionally, our decision in *Acosta* relied heavily on our reasoning in *Perez-Gonzalez*, which we have since abrogated in light of the BIA's decision in *Torres-Garcia*. *See Duran Gonzales I*, 508 F.3d at 1242. Because *Acosta* did not "unambiguously foreclose[ ]" the BIA's authority to interpret the interplay between

§ 212(a)(9)(C)(i)(I) and § 245(i), the BIA "remains the authoritative interpreter (within the limits of reason)" of these provisions. *Brand X*, 545 U.S. at 983.

2. The Reasonableness of the Agency's Interpretation

We now turn to whether the BIA's interpretation of the statutory framework is reasonable. Every circuit to have addressed the issue has concluded that *Briones* is a reasonable interpretation of § 212(a)(9)(C)(i)(I) and § 245(i). *See Renteria-Ledesma*, 615 F.3d at 908; *Ramirez*, 609 F.3d at 337; *Mora*, 550 F.3d at 239; *Ramirez-Canales*, 517 F.3d at 910. We agree with our sister circuits and hold that the BIA's interpretation is reasonable.

The BIA noted that the current ambiguity between § 212(a)(9)(C) and § 245(i) was a consequence of a switch from the use of the term "deportable" to "inadmissible" to describe aliens who entered without inspection. *See Briones*, 24 I. & N. Dec. at 363. The BIA observed that Congress has generally limited adjustment of status to those aliens who have been "inspected and admitted" into the United States. *Id.* at 359. Section 245(i) authorized a "limited departure from the general 'inspection and admission' requirement." *Id.* at 360. Although Congress intended the requirement to discourage aliens from moving to the United States before becoming eligible for permanent residence, Congress found that the "inspected and admitted" policy forced relatives of permanent residents to leave the country just so they could apply for an immigrant visa at a U.S. embassy or consulate. *Id.* at 359-60.

The BIA then resolved the textual ambiguity by explaining that "the classes of aliens described in sections 245(i)(1)(A) and 212(a)(9)(C)(i)(I) are [not] coextensive." *Id.* at 365. That is, § 245(i) applies to *some* aliens who are physically present in the United States and entered without inspection, but § 212(a)(9)(C)(i)(I) precludes its application to those aliens who entered the country without inspection, stayed for at least

one year, departed the country, and then "enter[ed] or attempt[ed] to reenter the United States without being admitted." 8 U.S.C. § 1182(a)(9)(C)(i). The BIA supported its interpretation of § 212(a)(9)(C)(i)(I) by pointing out that subsection (a)(9)(C) is entitled " 'Aliens unlawfully present after *previous* immigration violations.' " *Briones*, 24 I. & N. Dec. at 366 (quoting 8 U.S.C. § 1182(a)(9)(C)). The BIA emphasized that "[i]t is the entry or attempted entry of an alien *subsequent to* his accrual of more than 1 year of unlawful presence that triggers inadmissibility under section 212(a)(9)(C)(i)(I), and not mere unlawful presence for more than 1 year." *Id.*

The latter class of aliens—whom the BIA refers to as "recidivists"—are not eligible for adjustment of status under § 245(i) because otherwise § 245(i) status adjustment would be "available to a whole new class of aliens who had *never* been eligible for it." *Id.* at 365-67. Additionally, the BIA deemed it "of crucial importance" to its interpretation "that in every other case where Congress has extended eligibility for adjustment of status to inadmissible aliens . . . it has done so unambiguously, either by negating certain grounds of inadmissibility outright or by providing for discretionary waivers of inadmissibility, or both." *Id.* at 367.

**[6]** This is a permissible reading of the statute. In light of the BIA's reasoned opinion, we hold that *Briones* is entitled to *Chevron* deference. *See Brand X*, 545 U.S. at 982. We conclude that aliens who are inadmissible under § 212(a)(9)(C)(i)(I) are not eligible for adjustment of status under § 245(i), and overrule *Acosta* to the extent it holds otherwise.

B.   *Retroactivity of the* Briones *Rule*

**[7]** Garfias contends that even if *Briones* controls the interpretive question in this case, the BIA should not have applied its conclusion to his case. In general, an agency is free to implement new administrative policies through adjudicative

procedures instead of rulemaking. *See SEC v. Chenery Corp.* (*Chenery II*), 332 U.S. 194, 201-03 (1947). We have added that an agency "may act through adjudication to clarify an uncertain area of the law, so long as the retroactive impact of the clarification is not excessive or unwarranted." *Montgomery Ward & Co. v. FTC*, 691 F.2d 1322, 1328 (9th Cir. 1982).

However, the *Brand X* twist here complicates the situation somewhat: because we have determined that our prior decision in *Acosta* must be overruled in light of the BIA's decision in *Briones*, it is not clear whether we, as a judicial decisionmaker, have changed the law, or whether it is the agency that has changed the law.[7] Thus, there are two possible answers to the retroactivity question: the analysis in *Chevron Oil Co. v. Huson*, 404 U.S. 97, 106-07 (1971), which sets forth retroactivity factors to consider when a court changes the law, and the *Montgomery Ward* test, 691 F.2d at 1333, which sets forth retroactivity factors to consider when an agency changes its law. Before turning to this question, we consider whether the BIA should have the opportunity to address the retroactivity question first, and whether a retroactivity analysis is even required.

## 1.  Exhaustion of Administrative Remedies

To begin with, we consider whether to address this issue for the first time on appeal. Garfias did not ask the BIA to consider the retroactive application of its decision in the first instance, although the second time his case was before the Board, the government had raised the argument that the BIA should follow *Briones* rather than *Acosta*.

---

[7]We do not mean to say, as Judge Paez argues, that an agency can overrule a judicial decision or that the agency "changed the law of this circuit." Paez Dissent. Op. at 12654-55. We still retain ultimate authority to determine whether to defer to the agency's interpretation. But when we do defer to an agency's interpretation of the law, it is not clear for purposes of determining which retroactivity analysis applies whether we or the agency effectively brought about the change in the law.

We have said that the exhaustion of administrative remedies with respect to the retroactivity issue is not required, except to invite the agency to correct its own error, if "record development is unnecessary and the [agency] has no special expertise to do the retroactivity analysis." *Chang v. United States*, 327 F.3d 911, 925 (9th Cir. 2003). Some courts have concluded that retroactivity is a question of law, and no deference to the agency's decision regarding retroactivity is appropriate, *see, e.g.*, *Microcomputer Tech. Inst. v. Riley*, 139 F.3d 1044, 1051 (5th Cir. 1998); *Mason Gen. Hosp. v. Sec'y of Dep't of Health & Human Servs.*, 809 F.2d 1220, 1224 (6th Cir. 1987); *Retail, Wholesale & Dep't Store Union v. NLRB (Retail Union)*, 466 F.2d 380, 390 (D.C. Cir. 1972), while others have taken a more deferential approach to the agency's determination, *NLRB v. W.L. Miller Co.*, 871 F.2d 745, 748 n.2 (8th Cir. 1989) (collecting cases); *Yakima Valley Cablevision, Inc. v. FCC*, 794 F.2d 737, 746 (D.C. Cir. 1986) (an agency must explain its retroactivity decision before a court can review it).

We think that our position in *Chang* remains a sound one. If there is no need to defer to an agency's position on the issue, there is no particular reason to remand to allow the agency to consider in the first instance whether the rule should be applied retroactively. Because no further record development is necessary and the parties have briefed the issue thoroughly before this court, we will consider the question in the first instance.

### 2. Whether Any Retroactivity Analysis Is Required

Next, we reject the government's position that the BIA, as the authoritative interpreter of an ambiguous statute, has issued an interpretation in *Briones* that is comparable to "[a] judicial construction of a statute" and "is an authoritative statement of what the statute meant *before* as well as after the decision of the case giving rise to that construction." *Rivers v. Roadway Express, Inc.*, 511 U.S. 298, 312-13 (1994)

(emphasis added). Although it is true that the BIA is the authoritative arbiter of the meaning of the ambiguous provisions of the INA at issue here, *Brand X*, 545 U.S. at 983, its role is considerably more circumscribed than that of an Article III court construing federal law (where no agency is entitled to deference) or a state's high court construing its own law.

That principle is vividly illustrated by the present situation. In *Acosta*, we issued a binding interpretation of ambiguous provisions of the INA, which was authoritative in this circuit at least until the agency issued a reasonable interpretation to the contrary. If the agency had never done so, *Acosta* would still be good law. *Cf. Brand X*, 545 U.S. at 983. We construed the statute pursuant to "[t]he judicial Power" vested in us over "Cases . . . arising under . . . the Laws of the United States." U.S. Const. art. III, § 1, § 2, cl. 1. The BIA's authority to say what the law means, however, rests on the "executive Power" vested in the President and his general charge to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 1, § 3. We defer to an agency not because it is better situated to interpret statutes, but because we have determined that Congress created gaps in the statutory scheme that cannot be filled through interpretation alone, but require the exercise of policymaking judgment. *See Chevron*, 467 U.S. at 865 ("[A]n agency to which Congress has delegated policy-making responsibilities may, within the limits of that delegation, properly rely upon the incumbent administration's views of wise policy to inform its judgments."). "Deference under *Chevron* to an agency's construction of a statute that it administers is premised on the theory that a statute's ambiguity constitutes an implicit delegation from Congress to the agency to fill in the statutory gaps." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000); *see Brand X*, 545 U.S. at 980. Thus, the BIA's interpretation of the INA is not a once-and-for-always definition of what the statute means, but an act of interpretation in light of its policymaking responsibilities that may be reconsidered "on a continuing basis." *Chevron*,

467 U.S. at 864. We defer to the agency out of separation-of-powers concerns for the policymaking function of the executive because we are "not part of either political branch of the Government." *Id.* at 865. But, for similar reasons, the executive may not insist that we treat the BIA's construction of the INA as though it were a court of last resort exercising "judicial Power"; it is not. Indeed, the BIA equivocated over whether, post-*Briones*, it would acquiesce in our decision in *Acosta. See Briones*, 24 I. & N. Dec. at 371 n.9 ("We need not decide here whether to apply our holding in the Ninth and Tenth Circuits.").[8]

We conclude that we must treat an agency decision that is contrary to a ruling previously set forth by a court of appeals and, as a result of *Chevron* and *Brand X*, prompts the court of appeals to defer to the agency, as we would if the agency had changed its own rules. To do otherwise would ignore the effect of *Chevron* and treat the agency decision as though it had issued from the court itself. To the extent our precedent suggests the contrary, it is overruled in favor of the analysis we adopt today. *See, e.g., Duran Gonzales v. Dep't of Homeland Sec.* (*Duran Gonzales II*), 659 F.3d 930, 939-41 (9th Cir. 2011); *Morales-Izquierdo v. Dep't of Homeland Sec.*, 600 F.3d 1076, 1087-91 (9th Cir. 2010).

Chief Judge Kozinski, concurring in the judgment, asserts that we need not conduct a retroactivity analysis at all. *See* Kozinski Concur. Op. at 12626. However, he applies retroactivity principles to conclude that retroactivity analysis does

---

[8]Our back-and-forth with the BIA may illustrate the wisdom of remanding to the BIA where the BIA has not previously interpreted the statute and where we believe the statute is ambiguous. "Generally speaking, a court of appeals should remand a case to an agency for decision of a matter that statutes place primarily in agency hands." *INS v. Orlando Ventura*, 537 U.S. 12, 16 (2002) (per curiam); *see Velazquez-Herrera v. Gonzales*, 466 F.3d 781 (9th Cir. 2006) (per curiam) (remanding to the BIA to fill in a statutory gap). We anticipate that doing so will, in most situations, avoid the *Brand X* problem posed in this case.

not apply, effectively resolving the retroactivity question against Garfias.[9] *Id.* at 12626-28. We disagree with this approach. It conflates the result of a retroactivity analysis with the process of conducting it. We will perform the retroactivity analysis directly instead of applying the same principles to conclude that the analysis does not apply. *See* discussion *infra* pp. 12612-15.

### 3. Which Retroactivity Test Applies: *Chevron Oil* or *Montgomery Ward*

We now turn to the question of the appropriate test to apply to determine if *Briones* applies to Garfias retroactively. *Chevron Oil Co. v. Huson* addresses whether a rule changed by a court should be applied retroactively. 404 U.S. at 106-07.[10]

---

[9]Chief Judge Kozinski considers both Garfias's reliance interests and whether *Briones* represents a change in the law or merely settles it, ultimately coming to many of the same conclusions that we do. *See* Kozinski Concur. Op. at 12627 (concluding that remaining in the United States illegally is not a valid reliance interest because "Garfias is not entitled to continue defying this country's immigration laws"); *id.* at 12628 (concluding that filing an application for adjustment of status did not qualify as a reliance interest because Garfias applied before *Acosta* was issued); *see also id.* at 12626-27 ("Garfias can't point to any . . . action . . . to which today's holding attaches new legal consequences. Nor can [Garfias] point to any settled law that today's holding unsettles by imposing an additional burden on his past conduct.") (internal citations and quotation marks omitted); *id.* at 12628 ("At the time [Garfias] applied for adjustment of status, there was no law resolving the statutory ambiguity at issue here in his favor . . . [and] the obvious tension between sections 245(i) and 212(a)(9) meant that Garfias could have had no assurance that any subsequent interpretation of their interplay would be in his favor.") (internal quotation marks omitted); *id.* at 12629 ("*Briones* . . . *settled* the law").

[10]*Chevron Oil* articulated three factors to consider in making this determination: (1) whether the decision "establish[es] a new principle of law, either by overruling clear past precedent on which litigants may have relied, or by deciding an issue of first impression whose resolution was not clearly foreshadowed"; (2) a weighing of "the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its opera-

Since Chevron Oil was decided, the Supreme Court has strictly limited its application, *see Harper v. Va. Dep't of Taxation*, 509 U.S. 86, 95-96 (1993), and at least one court has held that *Chevron Oil* has been overruled altogether, *see United Food & Commercial Workers Int'l Union, Local No. 150-A v. NLRB*, 1 F.3d 24, 35 (D.C. Cir. 1993); *see also Nunez-Reyes v. Holder*, 646 F.3d 684, 691-92 (9th Cir. 2011) (en banc) (discussing these developments). The Supreme Court has emphasized that retroactive application is the presumptive norm, and implied that any exceptions to this rule must be narrow. *Harper*, 509 U.S. at 95-96. It has also emphasized that we are not to perform a retroactivity analysis on a case-by-case basis, but that we must decide whether a rule should be retroactive (or not) as applied to *all* cases currently pending. *Id.* at 96-97.

Last year, we affirmed the continuing validity of the *Chevron Oil* rule in this circuit. *Nunez-Reyes*, 646 F.3d at 692 ("As a circuit court, even if recent Supreme Court jurisprudence has perhaps called into question the continuing viability of its precedent, we are bound to follow a controlling Supreme Court precedent until it is explicitly overruled by that Court. We therefore remain bound by *Chevron Oil*." (citations omitted) (internal quotation marks omitted)); *see also id.* at 698 (Ikuta, J., concurring in part and dissenting in part) ("Although the reasons for severely limiting non-retroactive decisionmaking are clearly set out in *Harper*, the Court did not expressly overrule *Chevron Oil*. We therefore must continue to consider *Chevron Oil* where we are announcing a new rule of law for the first time and the parties have fairly raised the issue." *Id.* (footnote omitted) (citation omitted)). Thus,

---

tion"; and (3) "the inequity imposed by retroactive application." 404 U.S. at 106-07 (citation omitted) (internal quotation marks omitted). In practice, we see very little substantive difference between these factors and those of *Montgomery Ward. Cf. Dist. Lodge 64, Int'l Ass'n of Machinists & Aerospace Workers v. NLRB*, 949 F.2d 441, 447 (D.C. Cir. 1991); *Dole v. E. Penn Mfg. Co.*, 894 F.2d 640, 647 (3d Cir. 1990).

where the party has fairly raised the issue we "apply the three-pronged test outlined in *Chevron Oil* (1) in a civil case; (2) when we announce a new rule of law, as distinct from applying a new rule that we or the Supreme Court previously announced; (3) and when the new rule does not concern our jurisdiction." *Id.* at 691 (majority opinion).

For the reasons we explained in the previous section, however, we do not think the *Chevron Oil* test is well adapted to the *Brand X* situation. We are not announcing a new rule of law here because we have changed our mind about the correctness of our prior rule or because we have been corrected by a higher court. Rather we are approving and applying a new rule that the BIA announced in *Briones* and to which we must defer under the *Brand X* framework.[11] As we have noted, the BIA's decision fills a statutory gap and is an exercise of its policymaking function. *Chevron Oil*, as a framework for deciding when to apply a change in a court's decision retroactively, is, as a purely threshold matter, not the appropriate framework.

We believe *Montgomery Ward* is the better fit for this situation. *Montgomery Ward* addresses the situation when a "new administrative policy [is] announced and implemented through adjudication." 691 F.2d at 1328 (citing *Chenery II*, 332 U.S. at 202). In such a case, "the agency may act through adjudication to clarify an uncertain area of the law, so long as the retroactive impact of the clarification is not excessive or unwarranted." *Id.* We explained that although the agency was free to change or modify its position, the agency's interest in doing so must be "balanc[ed] [against] a regulated party's interest in being able to rely on the terms of a rule as it is written." *Id.* at 1333. To implement this balancing test, we

---

[11]As Judge Gould observes, although the BIA may have announced the rule, it "does not become binding in this circuit until we defer to that interpretation." Gould Concur. Op. at 12633.

adopted the framework set forth by the D.C. Circuit in *Retail Union*:

> (1) whether the particular case is one of first impression, (2) whether the new rule represents an abrupt departure from well established practice or merely attempts to fill a void in an unsettled area of law, (3) the extent to which the party against whom the new rule is applied relied on the former rule, (4) the degree of the burden which a retroactive order imposes on a party, and (5) the statutory interest in applying a new rule despite the reliance of a party on the old standard.

*Id.* at 1333 (quoting *Retail Union*, 466 F.2d at 390).

Although the five-factor *Montgomery Ward* test was developed in the context of an agency overturning its own rule, it has also been applied when court decisions formed part of the background. *See, e.g.*, *Miguel-Miguel v. Gonzales*, 500 F.3d 941, 951-53 (9th Cir. 2007) (noting that "both the BIA and this court" had adopted the rule at issue before the BIA decided to exercise its statutory discretion to change it); *ARA Servs., Inc. v. NLRB*, 71 F.3d 129, 135 (4th Cir. 1995) (noting that "the rule proposed by the Board represents an abrupt break with well-settled policy" because it "purports to overturn numerous court precedents and Board decisions" (internal quotation marks omitted)); *Local 900, Int'l Union of Elec., Radio & Mach. Workers v. NLRB*, 727 F.2d 1184, 1195 (D.C. Cir. 1984) ("Given the confusion in the Board's and courts' decisions over the years, the new rule cannot be called an abrupt break with a well-settled policy . . . ."). Although none of these cases actually analyzed the effect of a prior court decision on the *Montgomery Ward* framework, they indicate that the test is flexible enough to account for both agency and court precedent when considering the relevant legal background.

The *Montgomery Ward* test is more flexible than *Chevron Oil*, and allows us to take into account the intricacies of a *Brand X* problem, which are typically absent in a case where we have overruled our own decisions, as in *Nunez-Reyes*. Although *Montgomery Ward* involved an agency amending or overturning its own precedent and *Brand X* involved an agency disagreeing with a court's prior decision, the considerations in both situations are similar. When an agency consciously overrules or otherwise alters its own rule or regulation, we presume that it does so as an exercise of its judgment. Similarly, when an agency expressly considers and openly departs from a circuit court decision, we must presume that the agency has considered the court's reading of the statute in connection with the policies of the administration and has consciously disagreed with the court as a matter of its policymaking function. *See, e.g.*, *Torres-Garcia*, 23 I. & N. Dec. at 873 ("[W]e believe the Ninth Circuit's analysis regarding the availability of a retroactive waiver of the ground of inadmissibility set forth at section 212(a)(9)(C)(i) contradicts the language and purpose of the Act . . . .").

Importantly, because *Chevron* and *Brand X* are grounded in the deference we owe to agency policymaking, neither the presumption in favor of retroactive application nor the prohibition on considering retroactivity on a case-by-case basis applies.[12] Our concerns sound in equity. *See Chenery II*, 332 U.S. at 203 ("[R]etroactivity must be balanced against the mischief of producing a result which is contrary to a statutory design or to legal and equitable principles."). Both the presumption in favor of retroactive application, and the rule that a retroactivity analysis is not to be performed on a case-by-

---

[12]Judge Paez argues that because we are an Article III court we must follow Article III principles, which prohibit deciding retroactivity on a case-by-case basis. *See* Paez Dissent Op. at 12654-55, 12656-59. As we have explained, and as *Montgomery Ward* illustrates, Article III principles are not always applicable to agency decisions and different concerns are at stake when we overrule a prior decision based on our duty to defer to a subsequent agency decision.

case basis with regard to judicial adjudications stem from the Supreme Court's directive in *Harper* "prohibit[ing] the erection of selective temporal barriers to the application of federal law in noncriminal cases." 509 U.S. at 97. As the Court explained,

> [w]hen this Court applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate our announcement of the rule.

*Id.*; *see James B. Beam Distilling Co. v. Georgia*, 501 U.S. 529, 540-43 (1991) (plurality opinion).

Although we have not previously considered whether *Harper* applies with equal force to an agency's creation of new law through adjudication, the other circuits to consider this issue have concluded that it does not. *See, e.g.*, *ARA Servs.*, 71 F.3d at 135 n.3 ("[T]he fact that Board adjudication has long existed in the interstices of retroactivity law argues in favor of a case-by-case approach to such rulings, rather than an attempt to fit them within one of the above global retroactivity principles."); *Laborers' Int'l Union v. Foster Wheeler Corp.*, 26 F.3d 375, 387 n.8 (3d Cir. 1994) (concluding that the rationales supporting the retroactivity of judicial decisions "do not apply analogously to administrative agency adjudications"); *Dist. Lodge 64, Int'l Ass'n of Machinists & Aerospace Workers v. NLRB*, 949 F.2d 441, 447 (D.C. Cir. 1991) ("These Article III grounds are inapplicable to administrative adjudications, so *Beam* does not clearly foreclose selective retroactivity here.").

In every case in which we have applied the *Montgomery Ward* test, we have done so on a case-by-case basis, for example, by analyzing whether a petitioner *actually* relied on a past rule, or by concluding that retroactivity *as applied* is imper-

missible. *See Miguel-Miguel*, 500 F.3d at 953 ("[B]ecause the *Montgomery Ward* analysis tilts decidedly in Miguel's favor, we hold that retroactive application of the [new] test *to his case* was impermissible." (emphasis added)); *Chang v. United States*, 327 F.3d 911, 929 (9th Cir. 2003) ("[A]fter applying the *Montgomery Ward* factors, we conclude that the application of the INS's intended change . . . is impermissibly retroactive *as applied* to Appellants." (emphasis added)); *Great W. Bank v. Office of Thrift Supervision*, 916 F.2d 1421, 1432 (9th Cir. 1990) (concluding that the bank in that case could not show justifiable reliance); *Oil, Chem. & Atomic Workers Int'l Union, Local 1-547 v. NLRB*, 842 F.2d 1141, 1145 (9th Cir. 1988) (finding a "significant" burden would be imposed on that litigant by retroactive application of the new rule); *Montgomery Ward*, 691 F.2d at 1334 (concluding that the new rule's retroactive impact would place an "unfair burden" on the litigant department store as compared to its similarly situated competitors). In light of this consensus, the absence of any guidance from the Supreme Court, and our conclusion that agency decisions are not analogous to court decisions, we see no need to reevaluate the *Montgomery Ward* case-by-case test after *Harper*.

Therefore, we hold that when we overturn our own precedent following a contrary statutory interpretation by an agency authorized under *Brand X*, we analyze whether the agency's statutory interpretation (to which we defer) applies retroactively under the test we adopted in *Montgomery Ward*, if the issue is fairly raised by the parties.

### 4.   Applying the Test to Garfias's Case

**[8]** Applying this test to the case before us, we conclude that Garfias cannot avoid the retroactive effect of *Briones* on his case.

The first factor of the *Montgomery Ward* test—whether the issue is one of first impression—was developed in a very dif-

ferent context and may not be suited to our situation. *Retail Union*, from which this factor was adopted, involved a dispute before the National Labor Relations Board ("NLRB") between a company and union workers with respect to workers who had been on strike, were permanently replaced, and were not offered the vacancies that opened when their replacements departed. 466 F.2d at 383-84, 387. Just before the NLRB's decision in *Retail Union*, another union had succeeded in convincing the Board to overturn "a well settled rule, enunciated and applied by the Board, that when an employer permanently replaced an economic striker, he was under no obligation thereafter to treat that striker other than as a new applicant for employment." *Id.* at 387. For the D.C. Circuit, a case of "first impression" in this context meant something different from what we ordinarily refer to as a "case of first impression." In the *Retail Union* context, a case of "first impression" was a case in which one party had successfully urged the NLRB to change its rule; a case of "second impression" was any subsequent case brought before the NLRB. The court was concerned that denying retroactive effect in a case of first impression would "deny the benefits of a change in the law to the very parties whose efforts were largely responsible for bringing it about [and] might have adverse effects on the incentive of litigants to advance new theories or to challenge outworn doctrines." *Id.* at 390. Additionally, to deny retroactive effect in a case of first impression would effectively render the NLRB's decision an advisory opinion and raise serious questions as to whether the NLRB had conducted a rulemaking in the guise of an adjudication. *See NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 763-66 (1969) (plurality opinion); *see also Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 221 (1988) (Scalia, J., concurring). Instead, the court in *Retail Union* recognized that it was in cases of "second impression" before the NLRB that concerns might arise over "lack of notice [to the party against whom the standard is to be applied retroactively] and the [party's] degree of reliance on former standards." 466 F.2d at

390 n.22; *see also Miguel-Miguel*, 500 F.3d at 951. In other words, the court was *more* likely to apply the new rule in a case of "first impression," but *less* likely to apply it in a case of "second impression."

*Retail Union*'s concerns over issues of "first impression" and "second impression" arose in the litigation-intensive context of the NLRB regulating labor disputes between private parties. These concerns may not be as well suited to the context of immigration law, where one of the parties will always be the government. Moreover, the NLRB is virtually unique among agencies in its "long-standing reliance on adjudication" and the common-law method. *See* Mark H. Grunewald, *The NLRB's First Rulemaking: An Exercise in Pragmatism*, 41 Duke L.J. 274, 278 (1991). The BIA, by contrast, relies on a complex combination of regulations promulgated by the Attorney General, its own interpretative decisions, and a detailed framework of statutes to establish national immigration policy. As Garfias is not analogously situated to either the union or the company in *Retail Union* because it was the government who brought about the change in the law, this *Retail Union* factor does not weigh in favor of either side. In any event, any question of unfairness in applying a new rule in cases of "first impression" or "second impression," such as surprise or detrimental reliance, is fully captured in the second and third *Montgomery Ward* factors. *See Montgomery Ward*, 691 F.2d at 1333-34 (considering the first three factors together as a single criterion).

The second and the third factors are closely intertwined. If a new rule "represents an abrupt departure from well established practice," a party's reliance on the prior rule is likely to be reasonable, whereas if the rule "merely attempts to fill a void in an unsettled area of law," reliance is less likely to be reasonable. *Retail Union*, 466 F.2d at 390-91. We have made it clear in this circuit that these two factors will favor retroactivity if a party could reasonably have anticipated the change in the law such that the new "requirement would not

be a complete surprise." *Montgomery Ward*, 691 F.2d at 1333-34; *see also Great W. Bank*, 916 F.2d at 1432. Decisions from other circuits, especially the D.C. Circuit, support this conclusion. In *Clark-Cowlitz Joint Operating Agency v. FERC*, an en banc court determined that any reliance interest was diminished because the previous rule was only in place for six months, and the rule's "presumably sunny prospects" were "beclouded" by the possibility of being overturned on appeal. 826 F.2d 1074, 1083-84 (D.C. Cir. 1987) (en banc). In *District Lodge 64, International Ass'n of Machinists & Aerospace Workers v. NLRB*, the D.C. Circuit held that multiple changes in the agency's position regarding the proper rule precluded reliance because the final decision "was not an extreme or unpredictable step," much less a "radical transformation." 949 F.2d at 447-48; *see also Verizon Tel. Cos. v. FCC*, 269 F.3d 1098, 1111 (D.C. Cir. 2001) (reliance is "something short of reasonable" "[i]n light of the ongoing legal challenges" to the old rule); *Gen. Am. Transp. Corp. v. ICC*, 872 F.2d 1048, 1061 (D.C. Cir. 1989) (reliance is discounted because the parties were aware of the precedent's vulnerability); *Elec., Radio & Mach. Workers*, 727 F.2d at 1195 ("Given the confusion in the Board's and courts' decisions over the years, the new rule cannot be called an abrupt break with a well-settled policy . . . .").

In this case, Garfias identifies only two specific reliance interests: the payment of a $1000 penalty fee to file his application, and the fact that, by filing for adjustment of status, he admitted his unlawful presence in this country to the INS. We conclude that neither of these factors favors Garfias because he filed his application well in advance of any court or agency decision holding that inadmissibility under § 212(a)(9)(C) is not a barrier to status adjustment under § 245(i). Garfias first filed his application in 2002, but *Perez-Gonzalez* and *Acosta* were not decided until two and four years later, respectively. Thus, Garfias clearly did not file his application in reliance on *Acosta*, or even the analogous decision in *Perez-Gonzalez*.

The only window in which Garfias's reliance interest based on our previous rule might have been reasonable is the 21-month period in 2006 and 2007 between the issuance of *Acosta* and *Briones*. After *Briones* was issued, he was on notice of *Acosta*'s vulnerability. At oral argument, Garfias directed us to the costs he expended when renewing his application for status adjustment in front of the IJ on remand, which occurred during this period between *Acosta* and *Briones*. For example, he had to renew his medical examination paperwork. However, there is nothing in the record which discloses the cost to Garfias of such paperwork, and the primary reliance interest identified—the penalty filing fee—is not implicated by the proceedings on remand.

Nor can we give much weight to the fact that Garfias admitted to his illegal presence within the United States by filing for adjustment of status. Garfias's situation is similar to the petitioner in *Fernandez-Vargas v. Gonzales*, who "tipped off the authorities to his illegal presence" by "fil[ing] an application to adjust his status to that of lawful permanent resident [under 8 U.S.C.] § 1255(i)." 548 U.S. 30, 35 (2006). The Supreme Court rejected the notion that the expanded provisions of IIRIRA should not be applied to him retroactively for other reasons, *id.* at 38-42, but remarked that "retroactivity law . . . is meant to avoid new burdens imposed on completed acts, not all difficult choices occasioned by new law," and the petitioner only "complain[ed] of . . . the application of new law to continuously illegal action within his control both before and after the new law took effect," *id.* at 46. The Court then rejected the petitioner's position that he had "a right to continue illegal conduct indefinitely under the terms on which it began." *Id.* Nothing in *Briones* "impair[s] rights a party possessed when he acted, increase[s] a party's liability for past conduct, or impose[s] new duties with respect to transactions already completed." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 280 (1994). Applying this logic to Garfias's situation, we cannot help but conclude that we should not be overly solici-

tous of Garfias's interest in continuing to avoid the consequences of his violation of our immigration laws.

Moreover, the reasons that require us to defer to the BIA's decision in *Briones* also work against Garfias in this case. From the outset, the tension between § 212(a)(9)(C) and § 245(i) was obvious. That ambiguity in the law—which resulted in a six-year dialogue between the BIA and us—should have given Garfias no assurances of his eligibility for adjustment of status. Garfias might have had reason to be encouraged after our generous reading of the statute in *Perez-Gonzalez* and *Acosta*, but, even then, any reliance he placed on our decisions held some risk because our decisions were subject to revision by the BIA under *Chevron* and *Brand X*. Given the specific facts and timing of this case, we conclude that the second and third factors weigh against Garfias.

We recognize that the fourth factor—the degree of burden imposed on Garfias—strongly favors him. Although the relief he applied for is ultimately discretionary, " '[t]here is a clear difference, for the purposes of retroactivity analysis, between facing possible deportation and facing certain deportation.' " *Miguel-Miguel*, 500 F.3d at 952 (quoting *INS v. St. Cyr*, 533 U.S. 289, 325 (2001)). Furthermore, "deportation alone is a substantial burden that weighs against retroactive application of an agency adjudication." *Id.*

The fifth factor—the statutory interest in applying a new rule—points in favor of the government because non-retroactivity impairs the uniformity of a statutory scheme, and the importance of uniformity in immigration law is well established. *See, e.g., Cazarez-Gutierrez v. Ashcroft*, 382 F.3d 905, 912 (9th Cir. 2004) (stressing "the strong interest in national uniformity in the administration of immigration laws"). The government's interest in applying the new rule retroactively may be heightened if the new rule follows from the "plain language of the statute," *Great W. Bank*, 916 F.2d at 1432. Here it is clear from the multiple approaches taken

to solving this problem that the answer is anything but "plain." The new rule does not follow from the plain language of the statute because there is an inconsistency between two statutory provisions. The statutory interest in applying the new rule retroactively thus favors the government, but because the government cannot claim that the new rule follows from the plain language of the statute, the factor only leans in the government's direction.

**[9]** In sum, although we recognize the burden that retroactivity imposes on Garfias, the second, third, and fifth factors in this case outweigh that burden. When he filed his § 245(i) application in 2002, Garfias had no reliance interest because the law was not settled or well established. Garfias's is not a case "where the [agency] had confronted the problem before, had established an explicit standard of conduct, and now attempts to punish conformity to that standard under a new standard subsequently adopted." *Retail Union*, 466 F.2d at 391. We hold that the BIA properly applied the *Briones* rule to Garfias.[13]

## C. *Voluntary Departure Regulations*

Finally, Garfias challenges the automatic termination of the BIA's grant of voluntary departure. First, he argues that notwithstanding 8 C.F.R. § 1240.26(i), which provides for the automatic termination of a voluntary departure grant upon the filing of a petition for review, we retain equitable authority to stay the voluntary departure period. Second, he argues that the Attorney General exceeded his authority when he promulgated the regulation pursuant to 8 U.S.C. § 1229c(e).

**[10]** Section 1229c(e) authorizes the Attorney General "by regulation [to] limit eligibility for voluntary departure under this section for any class or classes of aliens." 8 U.S.C.

---

[13]We express no opinion whether other applicants may avoid the retroactive effect of *Briones*.

§ 1229c(e).[14] The regulation at issue provides, in relevant part, that if an alien files a petition for review of a final removal order, "any grant of voluntary departure shall terminate automatically upon the filing of the petition or other judicial challenge." 8 C.F.R. § 1240.26(i). However, "an alien granted the privilege of voluntary departure . . . will not be deemed to have departed under an order of removal if the alien departs the United States no later than 30 days following the filing of a petition for review." *Id.* The rule was effective as of January 20, 2009. *See* Voluntary Departure: Effect of a Motion to Reopen or Reconsider or a Petition for Review, 73 Fed. Reg. 76,927, 76,927 (Dec. 18, 2008).

### 1. Whether the Court's Equitable Authority Survived the Regulation

We first consider whether we have equitable authority to stay Garfias's voluntary departure period regardless of 8 C.F.R. § 1240.26(i). We conclude that we do not.

The Supreme Court has explicitly reserved the question of whether courts retain equitable jurisdiction to grant stays of voluntary departure periods pending appellate review. *See Dada v. Mukasey*, 554 U.S. 1, 10-11 (2008) ("[S]ome Federal Courts of Appeals have found that they may stay voluntary departure pending consideration of a petition for review on the merits. This issue is not presented here, however, and we

---

[14]Although § 1229c(e) further provides that "[n]o court may review any regulation issued under this subsection," a separate section in the INA provides that "[n]othing . . . in any other provision of this chapter (other than this section) which limits or eliminates judicial review, shall be construed as precluding review of constitutional claims or questions of law raised upon a petition for review filed with an appropriate court of appeals in accordance with this section." 8 U.S.C. § 1252(a)(2)(D). Two courts have held that we may review legal and constitutional challenges to the regulation without addressing § 1129c(e). *See Hachem v. Holder*, 656 F.3d 430, 438 (6th Cir. 2011); *Patel v. Att'y Gen.*, 619 F.3d 230, 234 (3d Cir. 2010). The government does not argue otherwise.

leave its resolution for another day." (citations omitted)). Previously, we held that we have equitable authority to stay a petitioner's voluntary departure period. *El Himri v. Ashcroft*, 344 F.3d 1261, 1262-63 (9th Cir. 2003). Our sister circuits, except for the Fourth Circuit, agreed. *See, e.g.*, *Thapa v. Gonzales*, 460 F.3d 323, 332 (2d Cir. 2006); *Obale v. Att'y Gen.*, 453 F.3d 151, 157 (3d Cir. 2006); *Bocova v. Gonzales*, 412 F.3d 257, 267-68 (1st Cir. 2005) (rejecting the government's argument as "sheer persiflage"); *Lopez-Chavez v. Ashcroft*, 383 F.3d 650, 654 (7th Cir. 2004); *Rife v. Ashcroft*, 374 F.3d 606, 615-16 (8th Cir. 2004); *Nwakanma v. Ashcroft*, 352 F.3d 325, 327 (6th Cir. 2003) (per curiam). *But see Ngarurih v. Ashcroft*, 371 F.3d 182, 194 (4th Cir. 2004) ("Having concluded . . . that 8 U.S.C. § 1252(a)(2)(B) precludes judicial review of the BIA's order granting voluntary departure, we cannot evade this statutory directive by resort to equity.").

**[11]** However, each of these decisions was reached *before* the Attorney General promulgated 8 C.F.R. § 1240.26(i) in 2008. The First, Third, and Sixth Circuits have recently acknowledged that this regulation resolves the question of whether courts have authority to stay the voluntary departure period pending review, since it provides for the automatic termination of that period. *See Hachem*, 656 F.3d at 438 ("Prior to the promulgation of this regulation, there was a circuit split on the issue of whether or not a court of appeals had the discretion to stay voluntary departure. The new regulation resolved that issue." (citations omitted)); *Patel v. Att'y Gen.*, 619 F.3d 230, 234 (3d Cir. 2010) ("Under the plain language of 8 C.F.R. § 1240.26(i), we cannot stay a grant of voluntary departure after a petitioner seeks judicial review because the grant has already terminated."); *Hakim v. Holder*, 611 F.3d 73, 78 (1st Cir. 2010) ("That rule amended the voluntary departure regulation, which now, in part, provides that a grant of voluntary departure on or after January 20, 2009, automatically terminates with the filing of a petition for review.").

**[12]** We agree with our sister circuits. Garfias has given us no reason to believe that courts possess equitable authority to

stay voluntary departure periods contrary to the Attorney General's regulation. In § 1229c(e), Congress granted the Attorney General the authority to control grants of voluntary departure, and the Attorney General exercised this authority by deciding that a grant of voluntary departure terminates upon the filing of a petition for review. This regulation effectively abrogates our contrary decision in *El Himri*. 344 F.3d at 1262; *see United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 496 (2001) (noting that federal courts have equitable discretion "unless a statute clearly provides otherwise"). Accordingly, because the filing of a petition now automatically terminates a petitioner's grant of voluntary departure, we conclude that, assuming that 8 C.F.R. § 1240.26(i) is valid, we have no authority to issue an equitable stay of Garfias's voluntary departure period.

## 2. Whether the Regulation Is Authorized by Statute

**[13]** The Sixth Circuit has squarely held that 8 C.F.R. § 1240.26(i) is a reasonable interpretation of § 1229c(e), *Hachem*, 656 F.3d at 438, and several other circuits have applied the regulation or otherwise noted its existence, *see, e.g.*, *Patel*, 619 F.3d at 233-34 (noting that *Obale*, 453 F.3d at 157, has been superseded by the regulation); *see also Kimani v. Holder*, Nos. 11-1497, 11-2955 2012 WL 3590816 at *1 (7th Cir. Aug. 22, 2012); *Qingyun Li v. Holder*, 666 F.3d 147, 150 (4th Cir. 2011); *Hakim*, 611 F.3d at 78; *Sanchez-Velasco v. Holder*, 593 F.3d 733, 737 (8th Cir. 2010). We join the Sixth Circuit in finding the regulation to be a valid exercise of delegated power.

In determining whether an agency regulation is ultra vires, we apply the two-step *Chevron* analysis. *See Mejia v. Gonzales*, 499 F.3d 991, 996 (9th Cir. 2007). We hold that Congress has unambiguously granted the Attorney General authority to control the scope of voluntary departure grants in

§ 1229c and that he has reasonably exercised his authority in promulgating the regulation.[15]

Under § 1229c(b)(1), "[t]he Attorney General *may* permit an alien voluntarily to depart the United States at the alien's own expense if . . . the immigration judge enters an order granting voluntary departure in lieu of removal." 8 U.S.C. § 1229c(b)(1) (emphasis added). This permissive language affords the Attorney General discretion to decide whether to permit voluntary departure after it has been granted by the immigration judge.[16] If the Attorney General makes a decision not to permit voluntary departure he effectively terminates the immigration judge's previous grant. *See Van Dinh v. Reno*, 197 F.3d 427, 434 (10th Cir. 1999) (noting that "the Attorney General's discretion to permit voluntary departure under § 1229c(b) is specifically conditioned upon the entry of a separate order granting voluntary departure by an immigration judge who must find four conditions to exist before the order

---

[15]Judge Reinhardt claims that voluntary departure under § 1229c(b)(1) "ha[s] not . . . been thought to involve the relinquishment of procedural rights." Reinhardt Dissent. Op. at 12642. But the important question is not whether post-decisional relief has previously "been thought" to involve relinquishment of procedural rights, but whether the statute permits it. We conclude that it does.

[16]In dissent, Judge Reinhardt characterizes the statute as simply granting "the Attorney General—or, in practical terms, his delegees—*discretion* to grant or deny voluntary departure at the completion of the immigration proceeding." Reinhardt Dissent. Op. at 12648 (emphasis added). Judge Reinhardt treats § 1229c(b)(1) as if it read "the Attorney General *shall* permit an alien voluntarily to depart . . . if the immigration judge enters an order . . . ." Such a reading violates both the rules of grammar and the statutory scheme. *Compare* 8 U.S.C. § 1158(b)(1) (the Attorney General "may grant asylum" to qualified aliens), *with* 8 U.S.C. § 1154(b)(1) (the Attorney General "shall, if . . . [the alien] is eligible . . . approve the petition" for a visa); *see Spencer Enterprises, Inc. v. United States*, 345 F.3d 683, 691 (9th Cir. 2003) ("[The language of § 1154(b)] is very distinct from the discretionary language in the asylum context [§ 1158(b)(1)], which allows the Attorney General to deny asylum even to those applicants who meet the statutory eligibility requirements.").

may be granted" and that the Attorney General makes a "subsequent decision to allow the alien to depart voluntarily pursuant to that order"); *cf. Muigai v. U.S. INS,* 682 F.2d 334, 336-37 (2d Cir. 1982) ("The grant or denial of voluntary departure lies within the broad discretion of the Attorney General and his delegates in the INS. It is permitted only in meritorious cases and may be terminated by the Attorney General upon a showing of abuse." (citation omitted)). Since Congress has also granted the Attorney General the general power to "establish such regulations . . . as [he] determines to be necessary for carrying out" his authority under the INA, 8 U.S.C. § 1103(g)(2), the Attorney General properly issued 8 C.F.R. § 1240.26(i) pursuant to his discretion to terminate voluntary departure under 8 U.S.C. § 1229c(b)(1) and his authority under § 1103(g)(2) to issue regulations he deems necessary. *See Hachem*, 656 F.3d at 438 ("The statute makes clear that the grant of voluntarily departure is a discretionary matter. No alien is automatically entitled to such a grant. The Attorney General has reasonably created rules by which this discretion should be governed, just as the statute empowered him to do.").

Moreover, § 1229c(e), provides additional support for 8 C.F.R. § 1240.26(i). Section 1229c(e) expressly authorizes the Attorney General "by regulation [to] *limit* eligibility for voluntary departure under [§ 1229c] for any class or classes of aliens." 8 U.S.C. § 1229c(e) (emphasis added). This section gives the Attorney General authority to issue regulations explaining how he will exercise his discretion under § 1229c(b)(1). *See, e.g.*, *Dekoladenu v. Gonzales*, 459 F.3d 500, 506 n.5 (4th Cir. 2006) ("The statute does not guarantee voluntary departure even to eligible aliens. Rather, it . . . authorizes the Attorney General to issue regulations limiting eligibility for voluntary departure for any class or classes of aliens. As a practical matter, only a relatively small percentage of removable aliens are granted voluntary departure." (citation omitted) (internal quotation marks omitted) (alterations omitted)), *overruled on other grounds by Dada*, 554

U.S. at 6-8; *Cervantes-Ascencio v. INS*, 326 F.3d 83, 86 (2d Cir. 2003) ("Promulgating limits on eligibility for voluntary departure involves broad discretion by the INS, as does granting or denying voluntary departure. This discretionary component not only substantially curtails our review authority, but also precludes entitlement to such relief as a matter of right." (citations omitted)). The Attorney General's regulation is consistent with § 1229c(e) because it is a limitation on eligibility for voluntary departure for a class of aliens—those who wish to remain in the United States while appealing from the BIA's decision.

In his dissent, Judge Reinhardt argues that the Attorney General's regulation is not consistent with § 1229c(e) because the term "eligibility" under § 1229c(e) does not "encompass a condition . . . predicated on . . . future actions," such as an alien's decision to pursue an appeal. Reinhardt Dissent. Op. at 12645. For the reasons we have explained, we disagree with such a narrow and isolated reading of "eligibility;"[17] but

---

[17]It is not clear, as Judge Reinhardt argues, that by using the term "eligibility" Congress intended to limit the Attorney General's discretion to an *ex ante* determination of whether to permit voluntary departure. For example, suppose that the immigration judge makes a determination under § 1229c(b)(1) that an alien may voluntarily depart, based on the required finding that "the alien is, and has been, a person of good moral character for at least 5 years immediately preceding the alien's application for voluntary departure." 8 U.S.C. § 1229c(b)(1)(B). If shortly thereafter the alien commits a crime that clearly disqualifies her as a person of good moral character, the Attorney General may make the determination that the alien is ineligible for voluntary departure, despite the IJ's previous order.

The process is similar to the "two-step process" for asylum in which "the applicant [must] first . . . establish his *eligibility* for asylum . . . and second . . . show that he is *entitled* to asylum as a matter of discretion." *Kalubi v. Ashcroft*, 364 F.3d 1134, 1137 (9th Cir. 2004); *see also Silaya v. Mukasey*, 524 F.3d 1066, 1070 (9th Cir. 2008) ("Once eligibility is established, it is within the Attorney General's discretion to grant asylum."); *Zi Zhi Tang v. Gonzales*, 489 F.3d 987, 992 (9th Cir. 2007) ("Tang has established asylum eligibility. We remand for the Attorney General to

even assuming that his reading is correct, 8 C.F.R. § 1240.26(i) is still valid. Section 1229c does not specify when the Attorney General must decide eligibility for voluntary departure; it states only that he "may permit" an alien to voluntarily depart after the immigration judge's grant of voluntary departure. Whenever the Attorney General decides not to permit voluntary departure, and thereby terminates a grant, it is a determination of the alien's eligibility for voluntary departure at that moment in time. The fact that 8 C.F.R. § 1240.26(i) automatically terminates voluntary departure when an alien files a petition for review does not change the result—it is still a determination within the Attorney General's discretion that the alien cannot voluntarily depart. The regulation just announces how the Attorney General will exercise his discretion.

In sum, § 1229c gives the Attorney General discretion ("may permit") to *prohibit* and thereby terminate voluntary departure in § 1229c(b)(1) and authority to *limit eligibility* in § 1229c(e). Section 1229c does not contain any language that qualifies this discretion. Indeed, the rest of § 1229c only lists express limitations on the Attorney General's authority to *grant* voluntary departure. *See, e.g.*, 8 U.S.C. § 1229c(a)(2)(A) (imposing a general 120-day maximum on voluntary departure deadlines); *id.* § 1229c(b)(1) (imposing four limitations on the class of aliens eligible for voluntary departure); *id.* § 1229c(c) (prohibiting grants of voluntary departure to aliens "previously permitted to so depart after having been found inadmissible under section 1182(a)(6)(A)"). Contrary to Judge Reinhardt's view, Congress did *not* mandate that the voluntary departure require-

exercise discretion in deciding whether to grant asylum."); *Kumar v. Gonzales,* 444 F.3d 1043, 1056 (9th Cir. 2006) ("[W]e find Raj statutorily eligible for asylum, and we remand for an exercise of discretion on his asylum claim . . . ."); *Khup v. Ashcroft*, 376 F.3d 898, 905 (9th Cir. 2004) ("Khup is eligible for asylum and [we] remand for the Attorney General to make a discretionary decision regarding whether to grant asylum.").

ments listed in § 1229c(b)(1) would be exclusive. Reinhardt Dissent. Op. at 12641, 12643-44. Instead, Congress plainly contemplated that the Attorney General might further *limit eligibility* and *prohibit* voluntary departure.

We also note that the Attorney General's regulation, 8 C.F.R. § 1240.26(i), does not deprive an alien of his fundamental right to judicial review or penalize the alien for exercising that right. An alien who files a petition for review is free to voluntarily depart within 30 days of filing and pursue the appeal from outside of the United States. *See, e.g.*, *Contreras-Bocanegra v. Holder*, 678 F.3d 811, 813-14, 819 (10th Cir. 2012) (considering an appeal from an alien who was outside of the country); *Jian Le Lin v. U.S. Att'y Gen.*, 681 F.3d 1236, 1238 (11th Cir. 2012) (same); *Pruidze v. Holder*, 632 F.3d 234, 235 (6th Cir. 2011) (same); *Marin-Rodriguez v. Holder*, 612 F.3d 591, 592 (7th Cir. 2010) (same); *see also Nken v. Holder*, 556 U.S. 418, 424-25 (2009) (explaining that Congress has "lifted the ban on adjudication of a petition for review once an alien has departed"); *Dada*, 554 U.S. at 22 (noting that Congress has permitted aliens who have departed the United States to seek judicial review, but not a motion to reopen); *Patel v. Att'y Gen. of U.S.*, 619 F.3d 230, 235 (3d Cir. 2010) ("[U]nder 8 C.F.R. § 1240.26(i), an alien does not necessarily lose her right to file a petition for review. If she voluntarily departs within 30 days of filing a petition for review and provides evidence that she remains outside of the United States, she . . . can thus pursue her petition for review"). If an alien chooses to remain in the United States to pursue the appeal, the regulation does not penalize the alien for exercising the fundamental right to judicial review; rather, it penalizes the alien for remaining in the United States illegally while the appeal is pending.

The Attorney General's regulation may alter the alien's incentives to appeal, but it ultimately balances the interests of the alien and those of the government. Voluntary departure represents a quid pro quo between the alien and the govern-

ment. *Dada v. Mukasey*, 554 U.S. 1, 11 (2008). As the Supreme Court explained, "[i]f the alien is permitted to stay in the United States past the departure date to wait out the adjudication of the motion to reopen, he or she cannot then demand the full benefits of voluntary departure; for the benefit to the Government—a prompt and costless departure— would be lost." *Id.* at 19-20. That same benefit is lost to the government if an alien files a petition for review. The Attorney General's regulation restores the quid pro quo between the government and the alien.

**[14]** In light of the broad grant of discretion over voluntary departure in both § 1229c(b)(1) and § 1229c(e), we hold that the promulgation of 8 C.F.R. § 1240.26(i) was a proper exercise of the Attorney General's authority.

## IV.   CONCLUSION

**[15]** We defer to the BIA's holding that aliens who are inadmissible under INA § 212(a)(9)(C)(i)(I) may not seek adjustment of status under § 245(i). Furthermore, we hold that under the five-factor test of *Montgomery Ward*, this rule can properly be applied to Garfias because he filed his § 245(i) application before any court ruled he was eligible to do so. Finally, we hold that 8 U.S.C. § 1229c(e) unambiguously provides the Attorney General with the authority to promulgate 8 C.F.R. § 1240.26(i), and that Garfias's grant of voluntary departure terminated upon his decision to file a petition for review.

PETITION DENIED.

Chief Judge KOZINSKI, disagreeing with everyone:

The law is unsettled in many areas and parties often don't know the precise rule that applies to their past conduct until their case is decided. Thus, retroactivity issues lurk in many, perhaps all cases, yet we don't routinely conduct retroactivity analysis. Before we go into retroactivity mode, we must first determine whether this case involves a retroactive application of law. Because it doesn't, we have no reason to discuss retroactivity.

A law is retroactive when it "attaches new legal consequences to events completed" before it went into effect—a determination guided by considerations of "fair notice, reasonable reliance, and settled expectations." *Vartelas* v. *Holder*, 132 S. Ct. 1479, 1491 (2012) (internal quotation marks omitted). *INS* v. *St. Cyr*, 533 U.S. 289 (2001), illustrates a classic example of a retroactive law. The petitioner there pled guilty "almost certainly" in reliance that doing so would preserve his chance to seek section 212(c) relief—a "waiver of deportation" granted "at the discretion of the Attorney General." *Id.* at 293-94, 323, 325. St. Cyr thus took an action in the real world—giving up his rights to a fair trial, to a jury of his peers, to the presumption of innocence, to proof beyond a reasonable doubt—in exchange for a limited punishment that did not include losing his eligibility for 212(c) relief. *Id.* at 325. It was that completed act—the guilty plea—that animated the Court's conclusion that the statute was impermissibly retroactive. *Id.*; *see also Vartelas*, 132 S. Ct. at 1483-84 (holding that an IIRIRA provision was impermissibly retroactive because it "attached a new disability" to Vartelas's pre-IIRIRA guilty plea and conviction).

Garfias can't point to any similar action that he is "helpless to undo," *see Vartelas*, 132 S. Ct. at 1489 (internal quotation marks omitted), to which today's holding attaches new legal consequences. Nor can he point to any settled law that today's holding unsettles by imposing an additional burden on his

past conduct. *See id.* at 1490-92. There are, in fact, three separate reasons why retroactivity analysis has no place in today's opinion.

**1.** Garfias has done absolutely nothing in the real world that would trigger a retroactivity analysis, even if there had been settled law he could have counted on. *But see* p. 12628 *infra* (no settled law). Garfias entered and remains in the United States illegally, and that kind of ongoing conduct is certainly not entitled to solicitude under retroactivity analysis. *See Fernandez-Vargas* v. *Gonzales*, 548 U.S. 30, 46 & n.13 (2006). The only completed act Garfias can point to that might trigger retroactivity concerns is his application for adjustment of status, which required Garfias to bring himself out of the shadows and thereby increased his chances of being deported. But Garfias is not entitled to continue defying this country's immigration laws by keeping himself hidden from the authorities; he has no "right to continue illegal conduct indefinitely under the terms on which it began." *See id.* If filing his application "risked awakening the sleeping bureaucratic giant who might then resolve to initiate deportation proceedings," that is "a risk [ ]he always faced." *Hernandez de Anderson* v. *Gonzales*, 497 F.3d 927, 946 (9th Cir. 2007) (Tallman, J., concurring in part and dissenting in part); *cf. Duran Gonzales* v. *U.S. Dep't of Homeland Sec.*, 659 F.3d 930, 940-41 (9th Cir. 2011).

I am aware of *Ixcot* v. *Holder*, 646 F.3d 1202, 1210-14 (9th Cir. 2011), which holds that an illegal alien's decision to apply for discretionary relief is a sufficient past event to trigger retroactivity analysis. *Ixcot* echoes the reasoning of *Hernandez de Anderson*, where Judge Tallman quite properly dissented. *See supra*. We should take this opportunity to extirpate the *Hernandez-Ixcot* heresy, rather than perpetuating it. *But cf.* maj. op. at 12614 ("Nothing in [*In re Briones*, 24 I. & N. Dec. 355 (BIA 2007),] 'impair[s] rights a party possessed when he acted, increase[s] a party's liability for past conduct, or impose[s] new duties with respect to transactions already

completed.”’ (quoting *Landgraf* v. *USI Film Prods.*, 511 U.S. 244, 280 (1994)).

**2.** There is another, independent reason Garfias's case doesn't trigger retroactivity analysis: At the time he applied for adjustment of status, there was no law resolving the statutory ambiguity at issue here in his favor. *Briones* thus didn't create a new legal burden that didn't exist under “[t]he law then in effect.” *Landgraf*, 511 U.S. at 282 n.35. Garfias claims that *Briones* changed the law from our ruling in *Acosta* v. *Gonzales*, 439 F.3d 550, 556 (9th Cir. 2006), but *Acosta* was issued four years *after* he applied to become a permanent resident pursuant to INA section 245(i). *See* maj. op. at 12588-89. His only guidance when deciding whether to apply was the text of the INA, which included section 212(a)(9)(C)—a provision that seemed on its face to make him inadmissible. *See* maj. op. at 12588, 12591-92, 12615. The “obvious” tension between sections 245(i) and 212(a)(9)(C) meant that Garfias could have had no assurance that any subsequent interpretation of their interplay would be in his favor. Maj. op. at 12615.

*Briones* thus doesn't attach a new legal consequence to Garfias's decision to apply for adjustment of status. *See Vartelas*, 132 S. Ct. at 1491; *cf. Judulang* v. *Holder*, 132 S. Ct. 476, 489 n.12 (2011) (rejecting alien's argument that two BIA decisions were impermissibly retroactive on the grounds that the agency's “prior practice” in that area of the law was “so unsettled”). He is not situated similarly to the class of individuals who applied for adjustment of status after *Acosta* and before *Briones*. Accordingly, we have no occasion to consider the impact of applying *Briones* to everyone “who sought adjustment of status in reliance on *Acosta*,” as Judge Paez urges. *See* Paez dissent at 12659-60, 12666, 12668. We can make *that* decision when we get a petitioner who filed for relief after *Acosta*. *See Singh* v. *Napolitano*, 649 F.3d 899, 901 n.1 (9th Cir. 2011) (per curiam).

**3.** But even if Garfias had applied to adjust his status during the twenty-one month window between *Acosta* and *Briones*, his case still wouldn't merit retroactivity analysis because *Briones* didn't *change* the law; it *settled* the law. *See Nunez-Reyes* v. *Holder*, 646 F.3d 684, 691-92 (9th Cir. 2011) (en banc); *Montgomery Ward & Co.* v. *FTC*, 691 F.2d 1322, 1333 (9th Cir. 1982) (balancing test applies when necessary to protect "a regulated party's interest in being able to rely *on the terms of a rule as it is written*" (emphasis added)). An agency is the "authoritative interpreter" "of an ambiguous statute [it] is charged with administering" so long as its interpretation is "within the limits of reason." *Nat'l Cable & Telecomms. Ass'n* v. *Brand X Internet Servs.*, 545 U.S. 967, 983 (2005). No one should have been surprised by the interpretation announced in *Briones*. It was clearly foreshadowed by the BIA's earlier ruling in *In re Torres-Garcia*, 23 I. & N. Dec. 866 (BIA 2006), which predated *Acosta* by a month and held that an alien who was inadmissible under another provision of section 212(a)(9)(C) couldn't apply for adjustment of status under section 245(i). *See generally* maj. op. at 12592-94. *Acosta*'s interpretation of the statutory ambiguity clarified in *Briones* was provisional, not authoritative, for purposes of retroactivity analysis. *See Brand X*, 545 U.S. at 982-83. Authoritative interpreters operate by the Highlander principle: "There can be only one."

The majority opinion at least recognizes that the BIA is the "authoritative arbiter of the meaning of the ambiguous provisions of the INA at issue here," but then goes astray in suggesting that our interpretation of the provisions was "authoritative . . . at least until" the BIA issued *Briones*. Maj. op. at 12602. Thus, Garfias and the majority contend, the BIA's interpretation that contradicts our earlier interpretation in *Acosta* "brought about [a] change in the law." Maj. op. at 12600 n.7, 12603. Bosh. *Brand X* makes it perfectly clear that "a court's opinion as to the best reading of an ambiguous statute an agency is charged with administering *is not authorita-*

*tive.*" *Brand X*, 545 U.S. at 983 (emphasis added). *Briones* didn't change the law; it set it.

Nor can I agree with the majority's gratuitous discussion of separation of powers and its conclusion that "we must treat an agency decision that is contrary to a ruling previously set forth by a court of appeals and, as a result of *Chevron* and *Brand X*, prompts the court of appeals to defer to the agency, as we would if the agency had changed its own rules." Maj. op. at 12601-03. I find this discussion opaque and confusing —and not the least bit helpful.

The Supreme Court has made it clear that, in those areas where agencies have been delegated interpretive responsibility by Congress, they and they alone can speak with the authority as to what the law means. *See, e.g.*, *Brand X*, 545 U.S. at 982-83; *Chevron, U.S.A., Inc.* v. *Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-45 (1984); *see also* Peter L. Strauss, "Deference" is Too Confusing—Let's Call Them "*Chevron* Space" and "*Skidmore* Weight," 112 Colum. L. Rev. 1143, 1145-48 (2012). It's as if Congress gave these agencies magic fountain pens that they can use to interlineate the statutory text in order to fill gaps and resolve ambiguities. Our job is to apply the law to individual cases, based on the normal rules of construction, which include the requirement that we follow the authoritative interpretation of an agency. Where the agency has not yet spoken, our ruling is necessarily provisional and subject to correction when the agency chooses to adopt its own interpretation of the statute. *See* Kathryn A. Watts, Adapting to Administrative Law's *Erie* Doctrine, 101 Nw. U. L. Rev. 997, 1000-01 (2007).

We do, of course, set the law of the circuit, which is binding on all the courts—until the agency speaks. At that point we, along with every other court, are bound by a reasonable interpretation adopted by the agency. It is sophistry to claim, as the majority does, that this amounts to an agency changing its own rules—as if we were speaking on behalf of the agency

when we adopted our earlier interpretation. It's far simpler and more correct to say that we took an educated guess as to what the statute meant, just as we often guess what state laws mean in the absence of authoritative guidance from the state supreme court. *Cf. Brand X*, 545 U.S. at 983-84; *United Gas Pipe Line Co.* v. *Ideal Cement Co.*, 369 U.S. 134, 135 (1962) (per curiam). But when a state supreme court later contradicts us, we surely wouldn't say that the state court changed its mind. I see no point in adopting this fiction, and cannot join the rest of the panel in overruling our precedents cited on page 12603 of the majority opinion.

\* \* \*

The majority claims that I "conflate[ ] the result of a retro-activity analysis with the process of conducting it." Maj. op. at 12604. But we've held that where an agency's decision "would not have a retroactive effect . . . , we need not reach the less stringent standard set forth in *Montgomery Ward*." *Singh*, 649 F.3d at 901 n.1; *see also Judulang*, 132 S. Ct. at 489 n.12. The majority fails to acknowledge that there *are* cases that don't require retroactivity analysis because they don't involve a retroactive application of the law. The major-ity also doesn't give us any way to distinguish cases that raise a legitimate retroactivity question from those that do not, or even bother to explain why this case falls into the former cate-gory rather than the latter. What are those charged with apply-ing our law to gather from this? That it's up to every judge and every panel to conduct a retroactivity analysis whenever they feel it in their guts that the law is being applied retroac-tively?

The majority is also wrong when it suggests that my approach is equivalent to its own. *See* maj. op. at 12603-04 & n.9. I've advanced three separate reasons why I believe this case doesn't involve retroactive application of the law, but I don't need all three to reach that conclusion; any one, stand-ing alone, would be enough. I engage in no balancing and

weighing of factors against each other, whereas my colleagues do.

Balancing involves uncertainty because you have to predict how different judges will assess the factors, which is not always an easy task. This case illustrates my point: Having launched themselves into retroactivity mode, six of my colleagues pick one test while three others pick a different test. *Compare* maj. op. at 12625, *with* Paez dissent at 12668-69, *and* Gould conc. at 12632. One judge believes that either test comes to the same result, *see* Graber partial conc. at 12635, and another agrees with the majority's conclusion while applying the test favored by the dissent, *see* Gould conc. at 12632-33. As an en banc court, we have a responsibility to bring clarity to our law. By the time lawyers in this circuit get through reading all of our opinions, they'll be thoroughly confused.

I concur in Subsection III.B, maj. op. at 12599-12616, only to the extent that I agree *Briones* applies to Garfias. I join in the rest of the opinion.

---

GOULD, Circuit Judge, concurring:

I concur in the outcome of the majority opinion, and could join most of its analysis except for its decision in part III.B.3 to apply the test from *Montgomery Ward & Co. v. FTC,* 691 F.2d 1322, 1328 (9th Cir. 1982) for when agency decision should be applied retroactively. I also agree with most of the reasoning in the dissent of Judge Paez as to why the retroactivity test of *Chevron Oil v. Huson*, 404 U.S. 97 (1971) should be applied rather than *Montgomery Ward*. But I part company with Judge Paez's dissent as to its application of the *Chevron Oil* standard.

I would apply the three-factor test for retroactivity set forth in *Chevron Oil* to conclude that the rule of *In re Briones*, 24

I. & N. Dec. 355 (BIA 2007), that we adopt today, should be applied retroactively. We have said that we must apply the *Chevron Oil* test where "*we* announce a new rule of law that does not concern our jurisdiction." *Nunez-Reyes v. Holder*, 646 F.3d 684, 692 (9th Cir. 2011) (en banc) (emphasis added). Even though we now change our interpretation of the interplay between §§ 1182(a)(9)(C)(i)(I) and 1255(i) because the Supreme Court, in *National Cable & Telecommunications Association v. Brand X Internet Services*, 545 U.S. 967 (2005), has told us to defer to the BIA's authoritative interpretation of the ambiguities in the INA, it is our court that is announcing a new rule of law for our circuit, not the BIA. Indeed, although *Brand X* characterizes the subsequent and contrary agency interpretation here as authoritative, the BIA's interpretation does not become binding in this circuit until we defer to that interpretation. *See Nunez-Reyes*, 646 F.3d at 692 ("There is no question that our decision today establishes a new principle of law . . . by overruling clear past precedent on which litigants may have relied.") (internal quotation marks and alterations omitted).

*Brand X* does not transform the nature of our decision into an agency decision. Whether we adopt a new rule because of changed views on a complex analysis of underlying law, or because of a simple flash of insight accepted and followed, or because of our duty to abide Supreme Court precedent, our decision remains a judicial decision. The judicial power under Article III is in the courts, not in an agency with responsibilities relating to the decision.

I would apply the *Chevron Oil* test to conclude that the rule of *Briones* that we adopt today should apply retroactively. "The three *Chevron Oil* factors are: (1) whether the decision establishes a new principle of law; (2) whether retrospective operation will further or retard the rule's operation in light of its history, purpose, and effect; and (3) whether our decision could produce substantial inequitable results if applied retroactively." *Id*. at 692 (internal quotation marks, alterations, and

citations omitted). How does that test apply to the circumstances presented here?

First, it is unmistakable that our decision establishes a new principle of law because we overrule clear precedent established by *Acosta v. Gonzales*, 439 F.3d 550 (9th Cir. 2006). Second, I conclude that a "retrospective operation" of the *Briones* rule would "further . . . the rule's operation in light of its history, purpose, and effect," because § 1255(i) aims to give relief to a narrow group of aliens instead of to all those who have been deemed inadmissible for any reason. *See Briones*, 24 I. & N. Dec. at 359-60. Third, because the BIA clarified its position on the interplay between §§ 1182(a)(9)(C)(i)(I) and 1255(i) about 21 months after our decision in *Acosta*, I conclude that our decision here would not produce substantial inequitable results if applied retroactively. *See Nunez-Reyes*, 646 F.3d at 692-94 (describing a 10-year period during which aliens may have relied on our decision in *Lujan-Armendariz v. INS*, 222 F.3d 728 (9th Cir. 2000) to forego their right to a jury trial by pleading guilty to simple possession charge with the expectation of no adverse immigration consequences). As the majority points out, an alien who relied on our decision in *Acosta* had notice of its vulnerability as soon as *Briones* was issued. And, unlike in *Nunez-Reyes* where there was detrimental reliance because the alien waived important constitutional rights by relying on *Lujan-Armendariz* which we then overruled, here the main interest implicated is the alien's prerogative to continue to conceal his unlawful presence, an interest that, the majority points out, is of no legal significance. *See Nunez-Reyes*, 646 F.3d at 693-94. For these reasons, I conclude that our decision today should apply retroactively, hence my concurrence in the majority's result.

GRABER, Circuit Judge, concurring in part and dissenting in part:

I join Parts III-A and III-B of the majority opinion. It is a close question whether *Chevron Oil Co. v. Huson*, 404 U.S. 97 (1971), or *Montgomery Ward & Co. v. FTC*, 691 F.2d 1322 (9th Cir. 1982), provides the better framework for deciding the retroactivity issue when both an agency and a court (deferring to the agency's interpretation) change their construction of an ambiguous statute. Even if the *Chevron Oil* test applied here, however, I agree with Judge Gould's analysis of it. That is, under either framework, retroactive application of the new legal rule is appropriate.

I also join Part II of Judge Reinhardt's dissent, which concludes that 8 C.F.R. § 1240.26(i) exceeds the Attorney General's statutory authority.

REINHARDT, Circuit Judge, with whom PAEZ, Circuit Judge, joins, and with whom GRABER, Circuit Judge, joins as to Part II, dissenting:

I join in Judge Paez's dissent, which ably explains why the *Chevron Oil* test should guide our analysis regarding the adjustment of status issue, and why today's holding in that regard should apply prospectively only.

I write separately to express my disagreement with the majority's decision, in Part III(C) of its opinion, to uphold the Attorney General's regulation automatically terminating *voluntary departure* in the event that a non-citizen has the temerity to file a petition for review of the BIA's decision on the underlying issue with the court of appeals. 8 C.F.R. § 1240.26(i). The Attorney General's regulation effectively penalizes non-citizens for exercising a fundamental right in the American legal system: the right to judicial review of

executive action. The regulation is incompatible with the statutory scheme establishing voluntary departure and thus an improper exercise of the powers delegated to the Attorney General. The majority's decision to uphold the regulation is not only erroneous as a matter of law, but also, ultimately, renders our justice system less worthy of its name.

## I.

"The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws." So proclaimed Chief Justice John Marshall in *Marbury v. Madison*, one of our country's earliest cases reviewing executive action. 5 U.S. (1 Cranch) 137, 163 (1803). In the years since, the presumption of judicial review over administrative actions has become a fundamental principle of American law. *See INS v. St. Cyr*, 533 U.S. 289, 298 (2001).

This commitment to judicial review is particularly important in the review of decisions regarding removal. Few decisions will be more consequential in an individual's life than the decision to forcibly remove him from the country. The relief that a non-citizen seeks from immigration authorities is the last resort that a non-citizen has before being returned, against his will, to a country where he may have no ties or family, or where he may be subjected to imprisonment, torture, or certain death. Recognizing the gravity of such proceedings, we have asserted numerous times that non-citizens in removal hearings are entitled to due process protections under the Fifth Amendment. *See Campos-Sanchez v. INS*, 164 F.3d 448, 450 (9th Cir. 1999). We have explained that, consistent with that entitlement, non-citizens "must receive a 'full and fair hearing.' " *Id.*

Our court has joined the chorus of circuit courts lamenting frequent errors by Immigration Judges and the Board of Immigration Appeals in the handling of these important cases. *See, e.g., Cruz Rendon v. Holder*, 603 F.3d 1104, 1111 n.3

(9th Cir. 2010) ("We are deeply troubled by the IJ's conduct in this case, which exhibits a fundamental disregard for the rights of individuals who look to her for fairness."); *Mohamed v. Ashcroft*, 400 F.3d 785, 792 (9th Cir. 2005) ("Not only was the BIA's opinion an example of sloppy adjudication, it contravened considerable precedent."); *Colemnar v. INS*, 210 F.3d 967, 973 (9th Cir. 2000) ("Judges do little to impress the world that this country is the last best hope for freedom by displaying the hard hand and closed mind of the forces asylum seekers are fleeing."); *see also, e.g., Benslimane v. Gonzales*, 430 F.3d 828, 829-30 (7th Cir. 2005) (noting criticism of the BIA and IJ's by other circuit courts and concluding that the "adjudication of [immigration] cases at the administrative level has fallen below the minimum standards of legal justice"). It is thus not surprising that both the Supreme Court and our court frequently reject interpretations that would eliminate judicial review of these decisions. *See, e.g., Kucana v. Holder*, 130 S. Ct. 827, 839-40 (2010) ("When a statute is reasonably susceptible to divergent interpretation, we adopt the reading that accords with traditional understandings and basic principles: that executive determinations generally are subject to judicial review." (internal quotation omitted)); *Barrios v. Holder*, 581 F.3d 849, 857 (9th Cir. 2009); *but see Planes v. Holder*, 686 F.3d 1033, 1037 (9th Cir. 2012) (Reinhardt, J., dissenting from denial of rehearing en banc) (noting the panel's "inexplicable" decision to permit non-citizens to "be deported immediately after a trial court enters a judgment of guilt against them in a criminal case, before they have had the opportunity to obtain appellate review of their convictions").

Despite all this, the Attorney General's new regulation imposes drastic consequences on those non-citizens who seek nothing more than to have a court review what may be the single most significant legal action that will ever affect them. Prior to this regulation, a non-citizen who was granted voluntary departure at the conclusion of his removal proceedings was free to seek judicial review of the order requiring him to

leave the country, without jeopardizing his voluntary departure.[1] We held that we had the equitable authority to stay the voluntary departure period while a non-citizen's petition for review was pending before our court. *El-Himri v. Ashcroft*, 344 F.3d 1261, 1262-63 (9th Cir. 2003); *see also Dada v. Mukasey*, 554 U.S. 1, 10 (2008) (noting agreement of some other circuits and declining to address the question). The new regulation, which went into effect on the last day of Attorney General Mukasey's tenure in office,[2] punishes those non-citizens who have been granted voluntary departure for seeking judicial review, by terminating the grant of voluntary departure: "If, prior to departing the United States, the alien files a petition for review . . . or any other judicial challenge to the administratively final order, any grant of voluntary departure shall *terminate automatically* upon the filing of the petition or other judicial challenge . . . ." 8 C.F.R. § 1240.26(i) (emphasis added).

The disability imposed by the Attorney General's new regulation—forcing non-citizens to forgo their voluntary departure and instead depart under an order of removal, simply because they have exercised their right to judicial review—is substantial. A non-citizen gains numerous benefits from not being forcibly removed from the country. Voluntary departure not only permits non-citizens the time and freedom to organize their affairs in the United States before departing, but also provides legal benefits. Non-citizen who depart under an order of removal are barred for ten years from being admitted to the country. *See* 8 U.S.C. § 1182(a)(9)(A)(ii). Non-citizens who are ordered removed, who have accumulated at

---

[1]As explained below, non-citizens who are granted "pre-decisional" voluntary departure (that is, either prior to or during removal proceedings), and who forgo all other claims for relief, necessarily waive their right to appeal.

[2]*See* Voluntary Departure: Effect of a Motion To Reopen or Reconsider or a Petition for Review, 73 Fed. Reg. 76,927, 76,927 (Dec. 18, 2008) (final rule) ("This rule is effective January 20, 2009.").

least one year of illegal presence in the country, and who later re-enter the country are subject to a life-long bar on their presence in the United States. 8 U.S.C. § 1182(a)(9)(C)(i).[3] Those who are ordered removed and re-enter are also subject to criminal prosecution. 8 U.S.C. § 1326. None of these consequences, however, apply to individuals who are granted voluntary departure.

It is particularly perverse that the Attorney General, in attempting to deter non-citizens from seeking judicial review, has chosen to target those non-citizens who are granted voluntary departure at the conclusion of their proceedings. The qualifications for such "post-decisional" departure are not easy to meet: non-citizens who have been granted that form of relief must establish that they have been present in the United States for at least one year, that they have been of good moral character for at least the previous five years, that they have not committed certain criminal or other offenses, and that they have both the financial means to depart the country and the intent to do so. 8 U.S.C. § 1229c(b)(1). Of all non-citizens, those present in the country for a substantial period of time, who have been of good moral character, and who have not committed crimes would seem to be those whom the government might want to take the most care to prevent from being erroneously removed, and thus to ensure that they are not dissuaded from seeking judicial review. Yet it is these non-citizens, and only these non-citizens, who are being required to forfeit their right to judicial review under the Attorney General's regulation.

The Attorney General and the majority defend the regulation by arguing that non-citizens are perfectly free to pursue their petitions for review from abroad. This argument is spe-

---

[3]Both of these bars are subject to waiver, although only at the discretion of the Attorney General or the Secretary of Homeland Security, and, in the case of the lifetime bar, only after 10 years. *See* 8 U.S.C. § 1182(a)(9)(A)(iii), (a)(9)(C)(ii).

cious at best. For many non-citizens, the ability to pursue a petition for review from abroad is entirely meaningless. Many non-citizens face persecution, torture, or even death if they return home to their country. For them, the option to return home to face such horrors while a court of appeals considers rectifying any error by the BIA is no option at all.[4] Further, it is far from clear that the Attorney General actually has the capability to effectively return such a non-citizen to the United States in the event that a court (or the BIA upon remand from judicial review) were to grant relief to a non-citizen who departed. The Solicitor General's office recently admitted that its prior representations to that effect were less than forthcoming. *See* Letter of April 24, 2012, from Deputy Solicitor General Michael R. Dreeben at 4, *Nken v. Holder*, 556 U.S. 418 (2009) (No. 08-681) ("[T]he government is not confident that the process for returning removed aliens, either at the time its brief was filed or during the intervening three years, was as consistently effective as the statement in its brief in Nken implied.").[5]

## II.

One need not agree with all of the above legal criticisms of the Attorney General's regulation, however, in order to find that it was not within his authority to enact it. As set forth below, the Attorney General's regulation is neither a reasonable interpretation of the voluntary departure statute nor, as the Attorney General argues, a permissible exercise of his power to limit "eligibility" for voluntary departure. The regu-

---

[4]In addition, this defense offers no answer to the other regulation, enacted as part of the same rule-making process, that terminates voluntary departure upon a non-citizen's filing of a motion to reopen. 8 C.F.R. § 1240.26(e)(1). Motions to reopen terminate automatically upon a non-citizen's departure from the country. See *Dada v. Mukasey*, 554 U.S. 1, 5 (2008) ("departure has the effect of withdrawing [a] motion to reopen").

[5]Available online at http://online.wsj.com/public/resources/documents/return.PDF.

lation must be struck down as ultra vires and unreasonable, and the majority errs in holding to the contrary.

## A.

The statutory provision that creates voluntary departure for certain individuals who have been ordered removed ("post-decisional" voluntary departure) nowhere mentions the relinquishment of procedural rights. *See* 8 U.S.C. § 1229c(b). The Attorney General argues that his interpretation of the statute as containing such a requirement is a permissible exercise of his interpretive authority. Even assuming that the Attorney General's regulation is entitled to *Chevron* deference, however, it may be upheld only to the extent that it is "reasonable in light of the legislature's revealed design." *Ariz. Health Care Cost Containment Sys. v. McClellan*, 508 F.3d 1243, 1249 (9th Cir. 2007) (quoting *United States v. Haggar Apparel Co.*, 526 U.S. 380, 392 (1999)) (internal quotations omitted). Viewed in this light, it is clear that the Attorney General's regulation cannot be said to be consistent with Congress's revealed design of the voluntary departure statute.

Voluntary departure is the name given to *two* distinct types of statutorily-provided relief from removal. *See* 8 U.S.C. § 1229c(a), (b). Each type of voluntary departure reflects a careful, congressionally-crafted balance of incentives and obligations. The first form of voluntary departure is available to non-citizens either "in lieu of being subject to [removal] proceedings . . . or prior to the completion of such proceedings." 8 U.S.C. § 1229c(a)(1). This pre-decisional voluntary departure, as suggested by the fact that it must occur before the completion of removal proceedings, necessarily involves the relinquishment of certain procedural rights, including the right to petition for review. Thus, as the Attorney General has made clear, eligibility for this type of pre-decisional voluntary departure naturally requires that a non-citizen forgo the opportunity to apply for other types of relief from removal, such as an application for asylum, relief under the Convention

Against Torture, or cancellation of removal. *See In re Arguelles-Campos*, 22 I. & N. Dec. 811, 814-16 (BIA 1999) ("If an alien applies for voluntary departure before the conclusion of removal proceedings, no additional relief may be requested. If additional relief has been requested, such a request must be withdrawn."); 8 C.F.R. § 1240.26(b)(1)(i)(B). This also naturally requires that a non-citizen waive his right to petition for review of any issues regarding the removal proceedings. *See* 8 C.F.R. § 1240.26(b)(1)(i)(D).

The second form of voluntary departure, however, had not —at least, until the time of Attorney General Mukasey's regulation—been thought to involve the relinquishment of procedural rights. Rather, this second, post-decisional form of voluntary departure was available to all non-citizens "at the conclusion" of removal proceedings, regardless of whether they subsequently decided to seek judicial review. 8 U.S.C. § 1229c(b). As explained above, our circuit joined many others in finding that such voluntary departure was entirely consistent with judicial review. In accordance with the fact that post-decisional voluntary departure requires the government to expend additional resources pursuing a non-citizen's removal, the eligibility requirements for such post-decisional voluntary departure are significantly heightened. Although the eligibility requirements for pre-decisional voluntary departure are not particularly onerous,[6] Congress rendered the eligibility requirements for post-decisional voluntary departure substantially more difficult to meet, requiring a mandatory length of presence in the United States and good moral character, and imposing other significant conditions. 8 U.S.C. § 1229c(b)(1). Congress thus limited post-decisional voluntary departure to

---

[6]The only non-citizens rendered ineligible for such departure are those who have been convicted of an aggravated felony or those who have engaged in (or been associated with) terrorist activities. 8 U.S.C. § 1229c(a)(1). In addition, non-citizens who are arriving in the United States and who are placed in removal proceedings may not apply for pre-hearing voluntary departure, although they may voluntarily withdraw their applications for admission. 8 U.S.C. § 1229c(a)(4).

only a small subset of the non-citizens who complete removal proceedings. Consistent with this principle, Congress also differentiated between the forms of relief available under each type of voluntary departure. Whereas non-citizens granted pre-decisional voluntary departure may be given up to 120 days to voluntarily depart the country, and are not categorically required to post a bond, 8 U.S.C. § 1229c(a)(2)(A), (a)(3), non-citizens granted post-decisional voluntary departure are given only 60 days to depart, and are required by statute to post a bond for the costs of their departure, 8 U.S.C. § 1229c(b)(2)-(3).

The BIA has recognized the important distinction between these two statutory forms of relief, despite the fact that they have the same name:

> It is clear from the significant differences between voluntary departure under sections 240B(a) and 240B(b) of the Act [respectively, 8 U.S.C. § 1229c(a) and (b)] that Congress intended the two provisions to be used for different purposes. While the requirements for voluntary departure under section 240B(b) resemble those of voluntary departure under former section 244(e) in deportation proceedings, section 240B(a) requires much less from the alien. Under section 240B(a), an alien need not show that he has good moral character or that he has the financial means to depart the United States. An alien must request section 240B(a) relief either in lieu of being subject to proceedings, or early in removal proceedings. He must also voluntarily forego all other forms of relief. Thus, Immigration Judges can use section 240B(a) relief to quickly and efficiently dispose of numerous cases on their docket, where appropriate. We accept the need for such a tool and support its purpose.

*Arguelles-Campos*, 22 I. & N. Dec. at 817. The BIA thus has recognized that not only did Congress purposefully intend to

draw an important distinction between these two types of relief, but that the relinquishment of procedural rights was central to the distinction between the two.

With this new regulation, however, the Attorney General has violated that congressional design, by inserting a requirement for the relinquishment of procedural rights into the post-decisional voluntary departure process. Although, in some instances, it might be appropriate for an agency to read substantive provisions into congressional silence, here, Congress's "revealed design" forbids the Attorney General from doing so. *See Haggar Clothing*, 526 U.S. at 392 ("[A] court may conclude the regulation is inconsistent with the statutory language or is an unreasonable implementation of it. In those instances, the regulation will not control."). The Attorney General could not subvert the statutory design by, for example, limiting pre-decisional voluntary departure to only those non-citizens who are eligible for post-decisional voluntary departure, so as to essentially eliminate the distinction between eligibility for the two forms of statutory relief. *See Arguelles-Campos*, 22 I. & N. Dec. at 817 (enumerating the different eligibility requirements as a hallmark of the "different purposes" Congress intended for each form of voluntary departure). The Attorney General is equally barred from eliminating the distinction between the procedural prerequisites for these two forms of relief, by requiring the relinquishment of the right to judicial review as part of exercising the statutory entitlement to post-decisional voluntary departure.

Thus, the Attorney General's regulation automatically terminating voluntary departure is simply inconsistent with the statutory scheme. It cannot be upheld as a permissible exercise of the Attorney General's authority to interpret the voluntary departure statute.

**B.**

The Attorney General seeks to defend his regulation by pointing to 8 U.S.C. § 1229c(e), which permits him, by regu-

lation, to "limit eligibility for voluntary departure under this section for any class or classes of aliens." The majority essentially suggests that this provision constitutes *carte blanche* for the Attorney General to prohibit voluntary departure in any way he pleases and at any time he pleases, including after final administrative action affirming a grant of voluntary departure. In doing so, it errs.

The majority's reading is contrary to the unambiguous command of the statute, which, by its very terms, grants the Attorney General authority to limit only "eligibility" for voluntary departure. The plain meaning of the term "eligibility" simply does not encompass a condition, such as the one here, predicated on a non-citizen's future actions—that is, a condition predicated on events that are unknown and unknowable at the time that a determination is made. Rather, the meaning generally implies some ascertainable state of being at the time that the particular decision for which eligibility is relevant is made. Thus, for example, *Black's* defines the term as "[f]it and proper to be selected or to receive a benefit." *Black's Law Dictionary* 597 (9th ed. 2009) (emphasis added). The use of the present tense in that definition is no mistake, because "eligibility" simply does not encompass the fitness to *have been* selected, or to *have received* a benefit. "Eligibility" might encompass events that will occur in the future but whose status is presently determinable. It cannot, however, encompass the type of future condition in the Attorney General's regulation, which can only be described as a ground for *termination* of voluntary departure.[7]

---

[7]The Attorney General does not contend that he has the authority to terminate voluntary departure, separate from his ability to create conditions on eligibility. He does not assert—as the majority does, without citing any support for the proposition—that his discretion over the grant of such departure would permit him to terminate it on any ground, once it has been granted. Rather, the Attorney General contends that "the authority for this regulation is clearly rooted in the Attorney General's explicit statutory power to limit the class of aliens who are *eligible* for voluntary departure" (emphasis added).

Under the plain meaning of the term, the determination of "eligibility" is made when the immigration judge grants voluntary departure. If the Attorney General has exercised his discretion to limit eligibility for a "class" of which the non-citizen is a member, the individual seeking voluntary departure will be ineligible to be awarded that relief. Otherwise, he, like the non-citizen here, is eligible and may be granted such relief, if he otherwise qualifies.

Although the distinction may occasionally be elusive, the difference between a condition for "eligibility" and a condition for "termination" is not as trivial as the majority suggests. Neither the majority nor the government contends that a violation of the other eligibility criteria for voluntary departure (*e.g.*, good moral character) *after* the immigration judge has granted the non-citizen voluntary departure would constitute grounds for a determination that the non-citizen is not eligible. Nor does either point to any case to that effect.[8] In fact, another regulation issued by the Attorney General suggests just the opposite: that "eligibility" refers to a condition identifiable at the time that voluntary departure is granted. The regulation permits the Attorney General to *revoke* voluntary departure—that is, to declare it as having been improperly granted in the first place—but only upon finding that the application "should not *have been* granted." 8 C.F.R. § 240.25(f) (emphasis added). This regulation provides no permission to revoke voluntary departure for a *newly*-arising condition which, if originally present, would have kept a non-citizen from receiving voluntary departure. If "eligibility" had the broad meaning ascribed to it by the majority, there would be no need for this regulation to be so circumscribed.

---

[8]When, if ever, an award of voluntary departure may be *terminated* prior to its expiration date for wrong-doing or misrepresentation (aside from grounds existing at the time voluntary departure was granted) is another matter, one that is not raised by the Attorney General. *See* n.7, supra.

Indeed, our procedural due process jurisprudence recognizes that the distinction between the conditions relevant to eligibility and to termination is an important one, fundamental to the very existence of vested interests in life, liberty, and property. As the Supreme Court held in *Logan v. Zimmerman Brush*, "While the legislature may elect not to confer a property interest, it may not constitutionally authorize the deprivation of such an interest, once conferred, without appropriate procedural safeguards." 455 U.S. 422, 432 (1982) (internal quotations marks and alterations omitted). Permitting the executive to eliminate the distinction between the two legal concepts would "allow the State to destroy at will virtually any state-created [ ] interest" by claiming that its deprivation was simply a condition of the right having been granted in the first place. *Id.*

This majority's decision is contrary to the plain text of 8 U.S.C. § 1229c(e). There is simply nothing in that provision, or any other statutory provision to which the majority or the Attorney General can point, to suggest that, when Congress permitted the Attorney General to regulate eligibility requirements for voluntary departure, it also intended to permit him to terminate voluntary departure once it was granted, or to enact a regulation to that effect. The majority errs in granting the Attorney General that authority—and, in the process, by eviscerating the important distinction between eligibility for a right and the termination of that right.

## C.

Perhaps in recognition of the weakness of the Attorney General's rationale, the majority offers its own interpretation of the voluntary departure statute as support for the Attorney General's authority to promulgate the regulation. Its reading of the statute, however, is, in my view, unreasonable, clearly in error, and directly contrary to the manner in which the Attorney General construes the statute. Certainly, the Attorney General does not—and in all likelihood would not—urge

the adoption of the majority's rationale, and the majority errs in *sua sponte* making it the law of this circuit.

The majority reads the voluntary departure statute as requiring two different actions at two different times by two different actors—despite the fact that this is not, and has never been, the law; nor has it ever been the manner in which voluntary departure has been implemented. The majority states that the immigration judge must first enter an order granting voluntary departure upon finding that the non-citizen meets the statutory requirements and is "eligible" for relief. The majority then states that there is a *second* and subsequent step, which, it contends, occurs "*after* [voluntary departure] has been granted by the immigration judge" (emphasis added), at which the Attorney General "may permit" the non-citizen to voluntarily depart. The majority contends, as a result of this second step, that the Attorney General "may" for any reason "permit" or deny voluntary departure after it has been granted by the immigration judge and/or the Board of Immigration Appeals. According to the majority, the Attorney General may do so for any reason and at any time until the non-citizen has actually departed the country (or even, potentially, afterward). It is on the basis of this definition of "permit" that the majority argues that the statute affords the Attorney General the right to "terminate" the grant of voluntary departure—an authority that the Attorney General himself does not purport to possess, other than to the extent that he may do so by "limit[ing] eligibility . . . for any class or classes of aliens." *See* discussion *supra* Part II(B).

The majority entirely misapprehends the voluntary departure scheme. The language in the voluntary departure statute stating that the Attorney General "may permit" a non-citizen to voluntarily depart simply affords the Attorney General—or, in practical terms, his delegees—*discretion* to grant or deny voluntary departure at the completion of the immigration proceeding to the non-citizen if he has been determined to be eligible for that relief under the statute. *See Bazua-Cota v.*

*Gonzales*, 446 F.3d 747, 748 n.1 (9th Cir. 2006) (noting that, under 8 U.S.C. § 1252(a)(2)(B)(i), we lack jurisdiction to review the Attorney General's discretionary decision regarding voluntary departure). There are not two steps in this process separate in time and determined by two different government officials. Rather, the immigration judge, the Attorney General's delegee, both determines whether the non-citizen has satisfied the statutory requirements for voluntary departure and is therefore "eligible" for such relief and, at *the same time*, under the authority delegated to him by the Attorney General, exercises that official's discretion to grant or deny that relief. *See* 8 C.F.R. § 1240.26(c) (providing for grant of voluntary departure by an immigration judge). If the immigration judge determines that the non-citizen is eligible and decides to exercise the discretionary authority to grant relief, an order of voluntary departure is issued. In fact, there can be no grant of voluntary departure until the Attorney General has exercised his discretion and decided to grant the non-citizen that relief. The Board of Immigration Appeals (another of the Attorney General's delegees) may, on appeal, *review* the grant of voluntary departure and may either affirm the order or reverse it after determining either that the non-citizen is not, in fact, eligible for that relief under the statute or that the immigration judge improperly exercised his discretion in granting the relief (an administrative review that, incidentally, is not mentioned in the majority's description of the voluntary departure scheme). Often, however, the *only* and administratively final decision regarding voluntary departure will be the one made by the immigration judge, finding that the non-citizen is eligible for such relief and exercising the Attorney General's discretion to "permit" the non-citizen to voluntarily depart.

The majority errs in converting language that does nothing more than confer *discretion* on the Attorney General to *grant* voluntary departure when a non-citizen is found to be eligible for that relief into a free-floating power to *terminate* voluntary departure at *any* time, even *after* the grant of that relief has

become administratively final following his exercise of his
discretion. One might imagine that such broad authority pos-
sessed by the Attorney General would find ample support in
numerous precedents in our jurisprudence. It does not; nor
does the underlying reading of the statute that the majority
advances.[9] The majority points to no case recognizing the

___

[9]The majority offers two out-of-circuit cases to buttress its reading of
the voluntary departure statute as involving two distinct steps. Neither
does so.

The Second Circuit's decision in *Muigai* holds only that, after voluntary
departure has been granted and the time period for departing has expired,
the Attorney General (or his delegees) may make a discretionary and unre-
viewable decision whether to extend that period. *Muigai v. INS*, 682 F.3d
334, 337 (2d Cir. 1982). *Muigai* thus says nothing about the sequence of
decision-making in the ordinary administrative proceeding (that is, when
the time for voluntary departure has not expired, and thus provides no sup-
port at all for the majority's reading of the statute. (*Muigai* is, of course,
even less relevant today, now that the Attorney General's authority to
extend the voluntary departure period has been eliminated (a fact the
majority is acutely aware of). *See Dada*, 554 U.S. at 9-10.)

The Tenth Circuit's decision in *Van Dinh*, admittedly, *does* make the
distinction that the majority urges between an order by the Immigration
Judge and a later, and discretionary, decision by the Attorney General.
However, it does so in language that we have squarely recognized as *dicta*,
*see Spencer Enterprises, Inc. v. United States*, 345 F.3d 683, 691 (9th Cir.
2003) ("this interpretation was entirely unnecessary to the Tenth Circuit's
holding"), in support of two propositions that we have squarely rejected:
(1) that subsection (f) of the voluntary departure statute, 8 U.S.C.
§ 1229c(f), does not strip us of jurisdiction over the discretionary aspect
of the decision to deny voluntary departure, *see Esquivel-Garcia v.
Holder*, 593 F.3d 1025, 1030 (9th Cir. 2010) (citing that provision for the
proposition that we "lack jurisdiction to review" the Attorney General's
"discretionary determination" regarding voluntary departure), and (2) that
8 U.S.C. § 1252(a)(2)(B)(ii)'s jurisdiction-stripping provision extends to
decisions for which the discretionary authority is not established by stat-
ute, *see Kucana*, 130 S. Ct. at 839-40 ("To read § 1252(a)(2)(B)(ii) to
apply to matters where discretion is conferred on the Board by regulation,
rather than on the Attorney General by statute, would ignore [ ] congres-
sional design."); *Spencer*, 345 F.3d at 691. I strongly doubt the majority
wishes to reverse these well-established holdings rejecting the conse-
quences of the Tenth Circuit's decision.

broad and sweeping authority it gives the Attorney General to terminate voluntary departure after it has been finally granted.[10]

The majority reads the words in the voluntary departure statute beyond their sensible meaning, in the hope of supporting its dubious account of the Attorney General's powers that it must in order for the voluntary departure regulation to stand. Its reading is in error, and its decision, based upon this erroneous reading, would aggrandize the powers of the Attorney General beyond even his own desired reach, in a manner that is as unsupported as it is unwise.

## D.

Another provision in the Attorney General's regulation raises an important question that goes unaddressed by the majority. A subsequent portion of 8 U.S.C. § 1240.26(i) provides that a non-citizen who seeks judicial review, and whose voluntary departure is, as a result, automatically terminated, "will not be deemed to have departed under an order of removal if the alien departs the United States no later than 30

---

[10]The majority's analogy to asylum highlights the very distinction between discretion and termination that it refuses to recognize. The Attorney General may, in fact, terminate a grant of asylum—not because he has discretion to grant or deny that benefit, but because Congress has *specifically authorized* the Attorney General to "terminate[ ]" asylum in certain circumstances. 8 U.S.C. § 1158(c)(2). No such authorization can be found in the voluntary departure statute.

The asylum cases cited by the majority do not support its argument; to the contrary, they prove our point. The cases simply recognize that, when the Attorney General (or one of his delegees) finds, at the end of an asylum proceeding, that a non-citizen does not meet the eligibility criteria for asylum, there is no need for him to decide in that proceeding whether the non-citizen merits the favorable exercise of his discretion. Accordingly, when we reverse the Attorney General's determination regarding lack of statutory eligibility, we must remand for him to exercise in the remanded proceeding the discretion that he failed to exercise, but otherwise would have, in the initial proceeding. These cases say nothing about the Attorney General's ability to *terminate* asylum after it has been granted.

days following the filing of a petition for review," *id.*, in other words, not later than 30 days after his entitlement to voluntarily depart has automatically terminated.[11] If such an individual has not voluntarily departed,[12] and has not departed pursuant to an order of removal, what statutory provision governs his departure, and what conditions govern his future rights and disabilities?

It is far from clear that the Attorney General possesses the authority to create this new form of departure. The Attorney General did not cite to any such authority in its rule-making or its briefs before this court. *See generally* 73 Fed. Reg. 76,927 (Dec. 18, 2008) (final rule); 72 Fed. Reg. 67,674 (Nov. 30, 2007) (proposed rule). This lack of express authority is troubling in light of Congress's statement that the statutory procedures governing removal are the "sole and exclusive" procedures by which a non-citizen may be removed from the country. 8 U.S.C. § 1229a(a)(3).

Finally, I note that I do not read the majority opinion to foreclose the possibility that the 30-day departure period following automatic termination, created as part of this new form of departure, may be stayed. The regulation clearly intends that we would have no authority to stay *voluntary departure*

---

[11] A non-citizen who departs under this provision must also "provide[ ] to DHS such evidence of his or her departure as the ICE Field Office Director may require, and provide[ ] evidence DHS deems sufficient that he or she remains outside of the United States." *Id.*

[12] Any grant of voluntary departure has been "terminated" automatically upon filing of the petition for review. *See Patel v. Att'y Gen.*, 619 F.3d 230, 234 (3d Cir. 2010) (noting lack of authority to stay voluntary departure under the new regulation because "the grant has already terminated"); Voluntary Departure: Effect of a Motion To Reopen or Reconsider or a Petition for Review, 72 Fed. Reg. 67,674, 67,682 (Nov. 30, 2007) (proposed rule) ("Under this rule, since the grant of voluntary departure would be terminated automatically if the alien elects to file a petition for review, there would no longer be any period of voluntary departure to be stayed or tolled during the pendency of the judicial review.").

because, by virtue of the automatic termination, "there would no longer be any period of voluntary departure to be stayed or tolled during the pendency of the judicial review." 72 Fed. Reg. at 67,682. This logic would seem insufficient, however, to constrain our authority with regard to the new, 30-day departure period, which follows the automatic termination of the voluntary departure period. As the majority concedes, we retain equitable discretion "unless a statute clearly provides otherwise." *United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 496 (2001). The same principles that caused us to find that voluntary departure could be stayed in the first place might well support an argument that this new, 30-day departure period could also be stayed pending judicial review. Because Garfias-Rodriguez sought only a stay of his voluntary departure, however, and did not seek a stay of the new, unacknowledged, and unnamed 30-day departure period provided under this new form of departure, the question does not appear to be properly presented to us at this time. It will assuredly arise in the future, however.

## III.

The majority fails to recognize that there is, quite simply, no statutory authority for the Attorney General's regulation. The regulation conflicts with the congressional design, as expressed in the statutory scheme creating two distinct forms of voluntary departure, and finds no source in the statutory provision permitting the Attorney General to limit "eligibility" for voluntary departure. Further, there remains a serious question regarding the Attorney General's ability to create a new form of departure permitting non-citizens to depart, *after* their voluntary departure has terminated, without being removed. The majority thus errs in upholding this regulation as a legitimate exercise of the Attorney General's power.

I do not envy the immigration lawyer who must explain to his client the unconscionable logic inherent in the Attorney General's regulation. An immigrant's experience with our

legal system is likely to be among his last—and most lasting—impressions of our country. It hardly becomes a nation that pledges its allegiance to providing "liberty and justice for all" to forfeit the rights of non-citizens who do no more than seek a decision from our court.

I respectfully dissent.

---

PAEZ, Circuit Judge, joined by REINHARDT, Circuit Judge, dissenting:

I respectfully dissent. I agree with the en banc panel majority's conclusion in Part III(A) that the Board of Immigration Appeals's ("BIA") decision in *In re Briones*, 24 I. & N. Dec. 355 (BIA 2007), is entitled to *Chevron* deference. I part company with the majority in its analysis of whether our holding to defer to *Briones* should be applied retroactively. The majority contends that, in light of the deference we owe agency decisions under *National Cable & Telecommunications Association v. Brand X Internet Services*, 545 U.S. 967 (2005), "it is not clear whether we, as a judicial decision-maker, have changed the law, or whether it is the agency that has changed the law."[1] Maj. Op. at 12600. I do not agree. I therefore dissent from the analysis and conclusions contained in Parts III(B)(3) and (4) of the majority opinion.

*Brand X* makes it clear that an agency cannot overrule a judicial decision, and that a court's first-in-time interpretation of an ambiguous statute is binding unless and until that court issues a judicial decision changing its rule of law in deference to an agency's permissible, alternative interpretation. *Brand*

---

[1] Judge Bybee's qualification of this statement, namely, that "it is not clear for purposes of determining which retroactivity analysis applies whether we or the agency *effectively brought about* the change in the law," does not alter my view. Maj. Op. at 12600 n.7 (emphasis added).

*X*, 545 U.S. at 983-84. It follows from this principle that, in deferring to *Briones* and overruling our holding in *Acosta v. Gonzales*, 439 F.3d 550 (9th Cir. 2006), *we* have changed the law of this circuit. We are bound, therefore, to follow the constitutional principles applicable to Article III courts, including "the principle that litigants in similar situations should be treated the same, a fundamental component of *stare decisis* and the rule of law generally." *James B. Beam Distilling Co. v. Georgia*, 501 U.S. 529, 537 (1991). Indeed, the Supreme Court has admonished that "we can scarcely permit 'the substantive law [to] shift and spring' according to 'the particular equities of [individual parties'] claims' of actual reliance on an old rule and of harm from a retroactive application of the new rule." *Harper v. Va. Dep't of Taxation*, 509 U.S. 86, 97 (1993) (alterations in original) (quoting *Beam*, 501 U.S. at 543 (Souter, J., concurring)).

The majority's adoption of the retroactivity analysis we apply to an agency's articulation of a new rule, *see Montgomery Ward & Co. v. FTC*, 691 F.2d 1322, 1328 (9th Cir. 1982), violates these fundamental principles. In light of our recent decision in *Nunez-Reyes v. Holder*, 646 F.3d 684 (9th Cir. 2011) (en banc), I would conclude that *Chevron Oil Co. v. Huson*, 404 U.S. 97 (1971) supplies the proper rule of decision. Applying the *Chevron Oil* test, I conclude that our holding today should apply purely prospectively.

## I.

The Supreme Court explained in *Brand X* that *Chevron* deference is owed to an agency's interpretation of an ambiguous statute that contradicts a court's prior construction since agencies, not courts, fill "gaps" in the statues they are charged with administering. 545 U.S. at 992. Therefore, compelling agencies to follow judicial interpretations would " 'lead to the ossification of large portions of our statutory law,' by precluding agencies from revising unwise judicial constructions of ambiguous statutes." *Id.* (quoting *United States v. Mead*

*Corp.*, 533 U.S. 218, 247 (2001) (Scalia, J., dissenting)). In response to the dissent's concern that the majority's rule would allow agencies to effectively overrule judicial decisions, the Court cautioned that, where deference to an agency's reasonable interpretation is not required,

> the court's prior ruling *remains binding law* . . . . The precedent has not been "reversed" by the agency, any more than a federal court's interpretation of a State's law can be said to have been "reversed" by a state court that adopts a conflicting (yet authoritative) interpretation of state law.

*Id.* at 983-84 (emphasis added).

As the foregoing passage reveals, *Brand X* did not alter the fundamental balance of legislative and judicial power. It created nothing more than a new scenario wherein a court may, or sometimes must, change its prior rule of decision. Whether a court adopts a new rule because of revised views about the underlying law, because of intervening statutory changes, or because of its duty to decide in accord with Supreme Court precedent, its decision remains a judicial one. The same is true when a court overrules past precedent in deference to an agency.

## II.

It is axiomatic that Article III vests judicial power in the federal courts, not in agencies, and that our decisions are therefore constrained by its dictates. The Supreme Court's decisions in *Harper* and *Beam* elucidate the contours of this principle. In *Beam*, a Georgia distilling company brought a Commerce Clause challenge to an excise tax that distinguished between imported and local alcoholic products under the Commerce Clause. *See* 501 U.S. at 532. The Supreme Court had previously sustained a Commerce Clause challenge to a substantially similar Hawaii statute in *Bacchus Imports,*

*Ltd. v. Dias*, 468 U.S. 263 (1984). *Id.* The Supreme Court of Georgia agreed with the distillery that *Bacchus* established that the Georgia tax violated the Commerce Clause, but refused to apply *Bacchus* retroactively to afford the distillery relief. *Id.* at 533. The Supreme Court granted certiorari to consider the question of whether a rule of law, once announced and applied to the parties to the controversy, must be given full retroactive effect by all courts adjudicating federal law. *Id.* at 534.

Although the decision did not produce a unified opinion for the Court, a majority of Justices agreed that once a case has announced a rule of federal law and applied "that rule with respect to the litigants" before the court, no court may "refuse to apply [that] rule . . . retroactively after the case announcing the rule has already done so." *Id.* at 540. In reaching this conclusion, the Court eschewed such "selective prospectivity" because it results in unequal treatment of similarly situated litigants, in violation of fundamental principles of judicial adjudication. *Id.* at 537-38 ("[S]elective prospectivity . . . breaches the principle that litigants in similar situations should be treated the same . . . . 'We depart from this basic judicial tradition when we simply pick and choose from among similarly situated defendants those who alone will receive the benefit of a 'new' rule of constitutional law.' ") (quoting *Desist v. United States*, 394 U.S. 244, 258-259 (1969) (Harlan, J., dissenting)) (additional citation omitted); *see also id.* at 540 (noting that the "equality principle, that similarly situated litigants should be treated the same" in the criminal context "carries comparable force in the civil context").[2] For these reasons, the Court determined that "[t]he applicability of rules of law is not to be switched on and off according to individual hardship." *Id.* Courts may, however, conduct a "generalized enquiry" into "the equitable and reliance interests of parties absent but similarly situated." *Id.*

---

[2]The Court also criticized the rule of selective prospectivity because it "would only serve to encourage the filing of replicative suits[.]" *Id.* at 543.

In *Harper*, faced with a similar retroactivity question,[3] the Court "adopt[ed] a rule that fairly reflect[ed] the position of a majority of Justices in *Beam*: When this Court applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate our announcement of the rule." 509 U.S. at 96. The court rested its holding on a line of precedent affirming, in the criminal context,

> two "basic norms of constitutional adjudication." First . . . that "the nature of judicial review" strips us of the quintessentially "legislat[ive]' prerogative to make rules of law retroactive or prospective as we see fit. Second . . . that 'selective application of new rules violates the principle of treating similarly situated [parties] the same."

*Id.* at 95 (quoting *Griffith v. Kentucky*, 479 U.S. 314, 322-23 (1987)). In affirming *Beam*'s holding and extending this principle to the civil context, the court commented that its "approach to retroactivity heeds the admonition that '[t]he Court has no more constitutional authority in civil cases than in criminal cases . . . to treat similarly situated litigants differently." *Id.* at 97 (quoting *Am. Trucking Ass'n, Inc. v. Smith*, 496 U.S. 167, 214 (1990) (Stevens, J., dissenting)).

The Court's holding limited *Chevron Oil* to the extent that state and lower federal courts had relied upon it to curtail the retroactive application of rules already applied to the parties to the case announcing the rule, in consideration of the particular equities of each case:

---

[3]In *Harper*, the Supreme Court of Virginia refused to apply the Supreme Court's prior decision in *Davis v. Michigan Department of Treasury*, 489 U.S. 803 (1989), to the parties before it, denying relief to retired federal employees seeking refunds for state income taxes. 509 U.S. at 90-92. The Supreme Court granted certiorari and reversed.

> [O]ur decision today makes it clear that "the *Chevron Oil* test cannot determine the choice of law by relying on the equities of the particular case" and that the federal law applicable to a particular case does not turn on "whether [litigants] actually relied on [an] old rule [or] how they would suffer from retroactive application" of a new one.

*Id.* at 95 n.8 (quoting *Beam*, 501 U.S. at 543 (Souter, J., concurring)).

## III.

This precedent compels my conclusion that, as an Article III court, we should be guided by the fundamental principles of judicial adjudication. We may not weigh the retroactive effect of the rule we announce today in light of the equities of Mr. Garfias's particular circumstances, nor may we consider his individual reliance on *Acosta*. To do so would be contrary to the nature of judicial review, which prohibits our selective application of rules that we adopt, under *Brand X* deference or otherwise, to the parties before us based on our sympathies to particular litigants.[4] To do so would also no doubt threaten to encourage "replicative suits," since parties who have yet to file may try their hand, in the hope that we would look more favorably upon their circumstances. *Beam*, 501 U.S. at 543. Where equitable considerations play a role in our retroactivity analysis, therefore, we must conduct only a "generalized enquiry" into "the equitable and reliance interests of parties absent but similarly situated." *Id.*

---

[4] I am mindful that the Court in *Beam* and *Harper* addressed the weighing of equitable and reliance interests in a particular case in a different context, one in which a new rule of law had already been announced at the time its application to the litigants before the court was questioned. Nonetheless, *Harper* and *Beam*'s recitation of the fundamental principles of judicial review cannot be lightly cast aside, and should, I believe, guide our choice of a retroactivity principle appropriate to the judicial decision-making we must engage in under *Brand X* deference.

The rule of *Montgomery Ward* inherently involves—indeed *requires*—an individualized inquiry into the equitable and reliance interests of the litigants. *See* 691 F.2d at 1333 (stating that the third factor considers "the extent to which the party against whom the new rule is applied relied on the former rule" while the fourth factor considers "the degree of the burden which a retroactive order imposes on a party"). For this reason, it creates the anomalous result that similarly situated litigants will face different resolutions of their claims where some relied on the old rule of law to their detriment while others did not. Indeed, even the majority acknowledges the odd result that the *Montgomery Ward* rule creates. *See* Maj. Op. at 12616 n.13 ("We express no opinion whether other applicants may avoid the retroactive effect of *Briones*.").[5]

But this is not the only reason that *Montgomery Ward*'s retroactivity analysis appears inappropriate to the *Brand X* scenario. *Montgomery Ward* struck a delicate balance between an agency's prerogative to develop and implement administrative policy through adjudication, and the need to protect litigants from the unfair surprise of applying a newly developed interpretation to their case. *See* 691 F.2d at 1328-29; *see also Morales-Izquierdo v. Dep't of Homeland Sec.*, 600 F.3d 1076, 1090 (9th Cir. 2010) ("*Montgomery Ward* and its progeny deal with the problems of retroactivity created when an agency, acting in an adjudicative capacity, so alters an existing agency-promulgated rule that it deprives a regulated party of the advance notice necessary to conform its conduct to the rule.") (citations omitted).

In *Montgomery Ward*, Wards department store challenged a Federal Trade Commission cease and desist order which found that it had failed to comply with a rule requiring that customers have ready access to written warranty information. 691 F.2d at 1324-26. In reviewing the Commission's deci-

---

[5]I have no doubt that judicious immigration attorneys will heed this thinly veiled invitation to attempt a different result.

sion, the court first considered whether the order constituted an amendment of the rule, in which case the affected parties were entitled to adequate notice under the Administrative Procedure Act, or a mere adjudicatory restatement of the rule through application to unique facts. *Id.* at 1329. Having determined that certain portions of the order constituted a permissible interpretation of the rule, the court considered its retroactive effect. *Id.* at 1332.

The court stated that its task, in adopting the five retroactivity factors the majority now seeks to import to *Brand X* deference cases, was to "balanc[e] a regulated party's interest in being able to rely on the terms of a rule as it is written, against an agency's interest in retroactive application of an adjudicatory decision . . . ." *Id.* at 1333. The agency contended that its interest in retroactive application stemmed from its "inherent authority to interpret rules" and that any limit on the retroactive application of a rule announced through adjudication would "vitiate[ ]" the agency's essential policymaking function. *Id.* at 1334. In other words, the court sought to balance the agency's need to engage in an evolving process of statutory interpretation against the harms wrought against individual litigants who attempted to comply with the agency's rules, only to find that those rules were as-yet ill defined. *See id.* at 1328 (" 'Not every principle essential to the effective administration of a statute can or should be cast immediately into the mold of a general rule. Some principles must await their own development, while others must be adjusted to meet particular, unforeseeable situations. In performing its important functions in these respects, therefore, an administrative agency must be equipped to act either by general rule or by individual order.' ") (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 203 (1947)).

These same concerns simply do not inhere in a court's decision to overrule past precedent applying *Brand X* deference. While an agency's interpretive flexibility is essential to its policymaking functions, *stare decisis* ensures the stability of

judicial rules and mandates that our interpretations of statutes do not evolve in each case via the same dialectic process. *See Laborers' Int'l Union of N. Am. v. Foster Wheeler Corp.*, 26 F.3d 375, 386 n.8 (3d Cir. 1994) (noting that the retroactivity rationales articled in *Harper* and *Beam* "do not apply analogously to administrative agency adjudications, primarily because the doctrine of *stare decisis* is far less rigorous in that . . . . [A]n agency boasts both judicial and legislative powers. When an agency exercises its legislative powers, neither the 'cases' or 'controversies' prerequisite, nor the rule of *stare decisis*, rears its head.") (internal citations omitted); *Dist. Lodge 64, Int'l Ass'n of Machinists and Aerospace Workers v. NLRB*, 949 F.2d 441, 447 (D.C. Cir. 1991) (noting that "Article III grounds" such as *stare decisis* and the principle that litigants in similar situation should be treated the same "are inapplicable to administrative adjudications"); *see also NLRB v. Seven-Up Co.*, 344 U.S. 344, 349 (1953) ("The constant process of trial and error, on a wider and fuller scale than a single adversary litigation permits, differentiates perhaps more than anything else the administrative from the judicial process.").[6]

For these reasons, the *Montgomery Ward* framework is ill suited to resolving the retroactivity questions posed by *Brand X* deference.

---

[6]The majority's concession that the first *Montgomery Ward* factor "may not be . . . well suited to the context of immigration law" underscores my conclusion. Maj. Op. at 12612. As the majority explains, the first factor "arose in the litigation-intensive context of the NLRB regulating labor disputes between private parties" and "the NLRB is virtually unique among agencies in its 'long-standing reliance on adjudication' and the common-law method." *Id.* While the first *Montgomery Ward* factor indeed may not be well suited to the immigration law context, it is decidedly inapposite to the retroactivity concerns facing Article III courts. For this additional reason, therefore, I would not import the standard we apply to agency adjudication into our *Brand X* retroactivity analysis.

**IV.**

The proper rule of decision stems not from *Montgomery Ward* but from the three-factor test articulated in *Chevron Oil*. Although, as the majority notes, *Chevron Oil*'s continued validity has been questioned in light of *Beam* and *Harper*, we recently reaffirmed in *Nunez-Reyes v. Holder*, 646 F.3d 684 (9th Cir. 2011) (en banc), that *Chevron Oil* retains full force and effect "(1) in a civil case; (2) when we announce a new rule of law, as distinct from applying a new rule that we or the Supreme Court previously announced; (3) and when the new rule does not concern our jurisdiction." *Id.* at 691; *see also id.* at 691-92 (discussing cases that call *Chevron Oil*'s continuing validity into question). We must, of course, consistent with *Beam* and *Harper*, apply our rule of decision either purely prospectively or purely retroactively, and may not engage in the "selective prospectivity" that inheres in considering the equitable and reliance interests of individual litigants. *See id.* at 690.

Applying the *Chevron Oil* factors to the case at hand, I conclude that the rule of *Briones*, which we adopt today as the law of our circuit, should apply purely prospectively.

**A.**

"The three *Chevron Oil* factors are: (1) whether the decision 'establish[es] a new principle of law'; (2) 'whether retrospective operation will further or retard [the rule's] operation' in light of its history, purpose, and effect; and (3) whether our decision 'could produce substantial inequitable results if applied retroactively.' " *Nunez-Reyes*, 646 F.3d at 692 (quoting *Chevron Oil*, 404 U.S. at 106-07).

The first factor weighs against retroactivity. There is no question that we announce a new rule of law in overruling *Acosta* in deference to *Briones*. *Nunez-Reyes*, 646 F.3d at 692 ("There is no question that our decision today 'establish[es]

a new principle of law . . . by overruling clear past precedent on which litigants may have relied.' *Lujan-Armendariz* [*v. INS*, 222 F.3d 728 (9th Cir. 2000)] clearly announced the rule that equal protection required that we treat expunged state drug convictions as we do expunged federal drug convictions. Just as clearly, we overrule that holding today.") (quoting *Chevron Oil*, 404 U.S. at 106).[7] The majority acknowledges as much. *See* Maj. Op. at 12602 ("In *Acosta*, we issued a binding interpretation of ambiguous provisions of the INA, which was authoritative in this circuit at least until the agency issued a reasonable interpretation to the contrary. If the agency had never done so, *Acosta* would still be good law.").

The government argues that "there was no established practice or authoritative interpretation of the INA prior to *Briones*" because *Acosta* constituted a "non-authoritative interpretation" of the interplay between §§ 212(a)(9)(C)(i)(I) and 245(i), and because, "[i]n light of *Brand X*, aliens were on notice that *Acosta*'s interpretation was not authoritative and could not have foreclosed *Briones*'s subsequent authoritative interpretation of the statutes . . . ." Gov't Supp. Br. at 23. As the majority discusses in detail in Part III(B)(2) of the opinion, these arguments are premised on the novel, and equally unsupported notion that judicial interpretations of ambiguous statutes are not an authoritative statement of the law where an agency with policymaking expertise has yet to issue its own interpretation. I agree with the majority's detailed analysis rejecting this argument, and do not revisit it here. *See* Maj. Op. at 12601-04.

---

[7] *Cf. United States v. City of Spokane*, 918 F.2d 84, 89 (9th Cir. 1990) ("Our decision striking down this tax does not meet the tests of non-retroactivity. We overrule no precedent here and we do not decide an issue of first impression. As we have shown, our determination . . . does not proceed from some obscure and half-formed idea only now wrested into the light of day. Rather, it proceeds from a long, if sometimes wavy, line of Supreme Court authority.").

Moreover, I find wholly unpersuasive the government's contention that *Brand X* put undocumented immigrants on notice that *Acosta* might not be the law of this circuit at some point in the future. As the majority acknowledges, even the BIA "equivocated over whether, post-*Briones*, it would acquiesce in our decision in *Acosta*." Maj. Op. at 12603 (citing *Briones*, 24 I. & N. Dec. at 371 n.9 ("We need not decide here whether to apply our holding in the Ninth and Tenth Circuits.")). Given that the BIA itself was unclear about the legal landscape and the proper course to follow, it is unreasonable to presume that undocumented immigrants would foresee the decision that we reach today.

For these reasons, I conclude that our decision to overrule *Acosta* is a new rule of law and that this factor weighs against retroactivity.

## B.

The second *Chevron Oil* factor is more ambiguous. We explained in *Acosta* that "[t]he statutory terms of § 245(i) clearly extend adjustment of status to aliens living in this country without legal status. This broad statement was based on a recognition that the statute's purpose is to allow relatives of permanent residents to avoid separation from their loved ones." 439 F.3d at 554 (internal quotation marks and citations omitted); *see also id.* at 555 ("[P]enalty-fee adjustment of status is intended to prevent the needless separation of families.") (citation omitted). The BIA has concluded, by contrast, that § 245(i) was not intended to make adjustment of status available to recidivist offenders. *See Briones*, 24 I. & N. Dec. at 365-67. As the Supreme Court explained in *Brand X*, the BIA's "decision to construe th[e] statute differently . . . does not say that [our] holding was legally wrong. Instead, the [BIA] may . . . choose a different construction, since the agency remains the authoritative interpreter (within the limits of reason) . . . ." 545 U.S. at 983.

In light of these two alternative, yet correct, interpretations of § 245(i)'s purpose, it is unclear whether retroactive application will further the rule's operation. Nonetheless, because we owe deference to the BIA's reasonable interpretation of § 245(i), I conclude that this factor weighs in favor of retroactivity.

## C.

The third factor, like the first, weighs against retroactivity. Our precedent suggests that, in the usual case, where the first factor is met, so is the third, because inequity necessarily results from litigants' reliance on a past rule of law. *See Holt v. Shalala*, 35 F.3d 376, 380-81 (9th Cir. 1994) (finding the third *Chevron Oil* factor to be met "for the same reasons" as the first, since inequity would result from applying the new rule retroactively to the class of litigants who "reasonably relied on this Court's previous rule"); *see also Nunez-Reyes*, 646 F.3d at 692-93 (discussing inequities resulting from the court's abandonment of clear past precedent under the first *Chevron Oil* factor and stating that these inequities compel the conclusion that the third factor weighs against retroactivity since "[i]t would be manifestly unfair effectively to hoodwink aliens into waiving their constitutional rights on the promise of no legal consequences and, then, to hold retroactively that their convictions actually carried with them the 'particularly severe "penalty" ' of removal") (citation omitted).

More fundamentally, there is little question that our decision, if applied retroactively, could produce substantial inequitable results for the class of undocumented immigrants who applied for adjustment of status in reliance on *Acosta*. Deportation, particularly for an undocumented immigrant with a United States citizen spouse, is among the harshest of outcomes, rending families and threatening permanent separation from loved ones. *Cf. Nunez-Reyes*, 646 F.3d at 693 ("For those aliens who relied on *Lujan-Armendariz*, . . . '[t]he

potential for unfairness in the retroactive application' of today's decision 'is significant and manifest.' ") (quoting *INS v. St. Cyr*, 533 U.S. 289, 323 (2001) (alteration in original)). The Supreme Court has described deportation as a "harsh measure," *INS v. Cardoza-Fonseca*, 480 U.S. 421, 448 (1987), that "may result in loss of . . . all that makes life worth living." *Ng Fung Ho v. White*, 259 U.S. 276, 284 (1922).

In our own circuit, we have held that the third *Chevron Oil* factor was met where a change in the statute of limitations would have barred the cause of action, *Duncan v. Sw. Airlines*, 838 F.2d 1504, 1507-08 & n.4 (9th Cir. 1987), where a change in the rules regarding preservation of issues for appeal would have deprived litigants of the right to appeal, *States v. Givens*, 767 F.2d 574, 577-79 (9th Cir.), *cert. denied*, 474 U.S. 953 (1985), and where a change in the law would have expanded the scope of potential criminal liability, *United States v. Goodheim*, 651 F.2d 1294, 1297-98 (9th Cir. 1981), *abrogated on other grounds as recognized by United States v. Mulloy*, 3 F.3d 1337, 1340 n.2 (9th Cir. 1993). *Compare Gibson v. United States*, 781 F.2d 1334, 1339 (9th Cir. 1986) ("The final *Chevron* factor weighs dispositively against retroactive application, for it would yield substantial inequitable results to hold that the respondent slept on his rights at a time when he could not have known the time limitation that the law imposed upon him.") (internal quotations and citation omitted), *with Orozco v. United Air Lines, Inc.*, 887 F.2d 949, 953 (9th Cir. 1989) (finding that substantial injustice would not result from application of de novo, rather than arbitrary and capricious, standard of review to plan administrator's benefits determination, and therefore that the third *Chevron Oil* factor was not met). In my view, deportation, at a minimum, has a potential for injustice comparable to those events at issue in *Duncan*, *Givens*, and *Goodheim*.

For these reasons, I find that the third factor weighs decidedly against retroactivity.

**D.**

Balancing the factors, I conclude that the rule we adopt today should not apply retroactively. "The first criterion is the most important. It is 'the threshold test for determining whether or not a decision should be applied nonretroactively.' " *Jackson v. Bank of Haw.*, 902 F.2d 1385, 1390 (9th Cir. 1990) (quoting *United States v. Johnson*, 457 U.S. 537, 550 n.12 (1982)). The third factor, likewise, appears from our precedent to carry great weight, on balance, in the court's ultimate determination. *See Int'l Ass'n of Machinists and Aerospace Workers v. Aloha Airlines, Inc.*, 790 F.2d 727, 736 (9th Cir. 1986) ("Although the second *Chevron Oil* factor does favor retroactivity because it promotes the prompt resolution of labor disputes, the strength of the considerations relating to the first and third factors outweighs those relating to the second factor in this case."); *cf. NLRB v. Buckley Broad. Corp. of California*, 891 F.2d 230, 234 (9th Cir. 1989) (giving dispositive weight to the third factor, noting, "Buckley's argument fails under the third factor. There is no possibility of an inequitable result from retroactive application of the Board's new standard because the new standard works to Buckley's advantage.").

Our decision to overrule *Acosta* amounts to a complete reversal of a settled rule of law upon which a vulnerable class of litigants reasonably and detrimentally relied. The equities tip heavily in their favor, since those who sought adjustment of status in reliance on *Acosta* will face deportation if our rule applies retroactively. Though the second factor weighs in favor of retroactivity, in light of the strength of the first and third factors, I conclude that the rule of *Briones* should apply in this circuit purely prospectively.

**V.**

For these reasons, I respectfully dissent. The rule of *Chevron Oil*, not *Montgomery Ward*, should govern our retroactiv-

ity analysis in *Brand X* deference cases. Applying that rule here, our decision should apply prospectively, and Garfias's petition should be granted.[8]

---

[8]Because I would grant the petition, I have no occasion to address the merits of Garfias's challenge to the automatic termination of the BIA's grant of voluntary departure, addressed in Part III(C) of the majority opinion. Were I required to do so, I would agree with Judge Reinhardt's conclusion that 8 C.F.R. § 1240.26(i) is not "a permissible exercise of the Attorney General's authority to interpret the voluntary departure statute." Reinhardt dissent at 12644. I therefore join his dissent.

PRINTED FOR
ADMINISTRATIVE OFFICE—U.S. COURTS
BY THOMSON REUTERS—SAN FRANCISCO

The summary, which does not constitute a part of the opinion of the court, is copyrighted
© 2012 Thomson Reuters.